TROUTMAN SANDERS LLP
Christina H. Bost Seaton (CB-7667)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 704-6000
*Attorneys for Defendant*
*Hartford Life and Accident Insurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

JULIE JACOBY,                                    :    **No.: 07 Civ. 4627 (LAK) (RLE)**

                                    Plaintiff,    :

            -against-                             :

HARTFORD LIFE AND ACCIDENT INSURANCE             :
COMPANY,
                            Defendant.           :

-------------------------------------------------------------------X

## DEFENDANT'S BRIEF IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Table of Authorities ........................................................................................ iii

Introduction ................................................................................................... 1

Statement of Facts .......................................................................................... 2

I.    The Terms of the Plan Include Those Set Forth In The Group Policy Issued By
Hartford.......................................................................................................... 3

II.   The Claim File Contains Jacoby's Pertinent Medical History And There Is
Substantial Record Evidence Supporting The Decision Of Hartford That She
Was Not Totally Disabled................................................................................. 4

    A.    Jacoby was employed as an Executive Assistant for GSCP ................... 4

    B.    Jacoby began seeing Dr. Susan levine in September 2002 ................... 5

    C.    In December 2002, Dr. Levine referred Jacoby to an endocrinologist
in search of an explanation for her symptoms ....................................... 7

    D.    Dr. Levine referred Jacoby to a psychologisti n November 2002 ........ 7

    E.    Jacoby ceased working in December 2002 and filed a claim for
LTD benefits, which Hartford approved in September 2003 ............... 8

    F.    Jacoby continued to undergo testing and receive treatment in 2003-2004,
none of which provided any objective explanation for her claimed
symptoms ............................................................................................ 8

    G.    In January 2005, Dr. Podell prepared a second physical capacities
evaluation based on what Jacoby reported............................................ 10

    H.    Jacoby reported in July 2005 that she was too weak to engage even in telephone
conversations ...................................................................................... 10

    I.    Hartford conducted video surveillance of Jacoby in late 2005 which
revealed that her restrictions and limitations had been substantially
overstated ........................................................................................... 11

    J.    In January 2006, Jacoby began to see Dr. Ritchie Shoemaker of the
"Chronic Fatigue Center" .................................................................... 13

    K.    In March 2006, Jacoby gave statements to a Hartford investigator that were
markedly inconsistent with the videotaped surveillance ....................... 13

    L.    Hartford's Case Manager performed an internal review and concluded
that Jacoby could perform a sedentary job ........................................... 15

i

| | M. | In June 2007, Hartford submitted Jacoby's medical records for two independent physician reviews ................................................. 16 |
|---|---|---|
| | N. | On August 11, 2006, Hartford denied Jacoby continuing LTD benefits ............ 18 |
| | O. | After receiving the denial letter, Jacoby sought a neuropsychological evaluation .................................................................................19 |
| | P. | Jacoby appealed the denial decision and submitted additional evidence .......... 20 |
| | Q. | Hartford obtained two additional independent medical reviews on appeal ........22 |
| | R. | On April 23, 2007, Hartford denied Jacoby's appeal. ........................................ 25 |

ARGUMENTS ........................................................................................................................25

I.    The Decision Of Hartford To Deny Jacoby's Claim Is Evaluated Under An Arbitrary And Capricious Standard Of Review ................................................................. 25

II.   Hartford Is Entitled To Summary Judgment Because Its Decision To Deny Benefits Was Supported By Substantial Record Evidence .............................................27

| | A. | Jacoby Has The Burden Of Proving That Hartford's Decision Was Unreasonable .............................................................................................27 |
|---|---|---|
| | B. | There Is Substantial Evidence In The Record That Jacoby Is Not Disabled From Working In Any Occupation ...................................................................28 |
| | | 1.  There is no objective evidence of a disabling condition that would render Jacoby unable to perform a sedentary occupation and the credibility of her subjective complaints of pain and fatigue are undermined by the record ....................................................................28 |
| | | 2.  Hartford reasonably relied on the opinions of the independent doctors who reviewed Jacoby's records and spoke with her treating physician ............................................................................................ 33 |

CONCLUSION ......................................................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Bayonne v. Pitney Bowes, Inc.*, 161 Fed. Appx. 144 (2d Cir 2006) ...................................33

*Billinger v. Bell Atlantic*, 240 F. Supp. 2d 274 (S.D.N.Y. 2003), *aff'd*, 124 Fed.
    Appx. 669 (2d Cir. 2005) ...........................................................................................31

*Black & Decker Dis. Plan v. Nord*, 538 U.S. 822, 123 S. Ct. 1965 (2003).......................33

*Brigham v. Sun Life of Canada*, 317 F.3d 72 (1st Cir. 2003) .............................................28

*Butler v. The New York Times Co.*, 2007 U.S. Dist. LEXIS 18400 (S.D.N.Y.
    2007) ........................................................................................................................33

*Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142 (2d
    Cir. 2003) .................................................................................................................27

*Couture v. Provident Corp.*, 315 F. Supp. 2d 418 (S.D.N.Y. 2004).................................30

*Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989).........................................25

*Fitzpatrick v. Bayer Corp.*, 2008 U.S. Dist. LEXIS 3532 (S.D.N.Y. 2008)...............27, 31

*Gannon v. Aetna Life Insurance Co.*, 2007 U.S. Dist. LEXIS 72529 (S.D.N.Y.
    2007) ..............................................................................................................26, 32, 34

*Guglielmi v. Northwestern Mutual Life Insurance Co.*, 2007 U.S. Dist. LEXIS
    49182 (S.D.N.Y. 2007) ...........................................................................................26

*Jordan v. Retirement Committee of Rensselaer Poly. Institute*, 46 F.3d 1264 (2d
    Cir. 1995) .................................................................................................................27

*Kocsis v. Standard Insurance Co.*, 142 F. Supp. 2d 241 (D. Conn. 2001) .......................28

*Lee v. Aetna Life*, 2007 U.S. Dist. LEXIS 38205 (S.D.N.Y. 2007)..................................26

*Lekperic v. Building Serv. 32B-J Health Fund*, 2004 U.S. Dist. LEXIS 14020
    (E.D.N.Y. 2004)......................................................................................................34

*Maniatty v. UnumProvident Corp.*, 218 F. Supp. 2d 500 (S.D.N.Y. 2003).....................30

*Marx v. Meridian Bancorp, Inc.*, 2002 U.S. App. LEXIS 5277 (3d Cir. 2002) ...............28

*McCauley v. First Unum Life Insurance Co.,* 2006 U.S. Dist. LEXIS 73093
(S.D.N.Y. 2006) ...................................................................................3, 26

*Miller v. United Welfare Fund,* 72 F.3d 1066 (2d Cir. 1995).......................2, 26

*Paese v. Hartford Life & Accident Insurance Co.,* 449 F.3d 435 (2d Cir. 2006) .............27

*Pagan v. NYNEX Pension Plan,* 52 F.3d 438 (2d Cir. 1995) ..................................3, 26, 28

*Parisi v. UnumProvident Corp.,* 2007 U.S. Dist. LEXIS 93472 (D. Conn.
2007) ........................................................................................30, 32, 33

*Pava v. Hartford Life & Accident Insurance Co.,* 2005 U.S. Dist. LEXIS 41753
(E.D.N.Y. 2005)......................................................................................27

*Pulvers v. First Unum Life Insurance Co.,* 210 F.3d 89 (2d Cir. 2000) ....................26, 27

*Rosario v. Local 32B-32J,* 2001 U.S. Dist. LEXIS 11919 (S.D.N.Y. 2001)....................34

*Ware v. Northeastern Vt. Reg'l Hospital,* 2006 U.S. Dist. LEXIS 17170 (D. Vt.
2006) ......................................................................................................27

*Waterbury v. Liberty Life Ins. Co.,* 202 Fed. Appx. 477 (2d Cir. 2006)......................33, 34

## STATUTES

Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, *et seq* ...................1

Defendant Hartford Life and Accident Insurance Company ("Hartford"), by counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, hereby submits this memorandum in support of its motion for summary judgment.

## INTRODUCTION

Plaintiff Julie Jacoby ("Jacoby") has filed this suit arising out of the denial of her claim for continuing long term disability benefits under an employee welfare benefit plan ("the Plan") sponsored by her employer. The Plan is funded, at least in part, by a group disability insurance policy issued by Hartford. Jacoby's claim is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq.* Jacoby was employed as an Executive Assistant for GSCP (NJ) LP ("GSCP"), an investment firm located in Florham Park, New Jersey. Jacoby claims she suffers from a variety of subjective and/or self-reported physical symptoms, such as fatigue, weakness, pain, and cognitive difficulties, that she has a diagnosis of chronic fatigue syndrome, and that these conditions render her completely disabled from working in any job.[1]

Jacoby stopped working on December 20, 2002, based on her claim of extreme fatigue. Hartford initially allowed Jacoby long term disability benefits during a 36-month "own occupation period," but in 2005, near the conclusion of that three-year period, Hartford began to re-evaluate Jacoby's eligibility for continuing long term disability benefits. Under the "Any Occupation" provision of the Plan, which governed Jacoby's claims, she had the burden to prove that she was unable to perform the essential duties of any occupation for which she was qualified by education, training or experience as a prerequisite for the continuation of her long term disability benefits. Ultimately, Jacoby's claim for continuing long term disability benefits was

---

[1] In her Complaint, Jacoby claims only that she is disabled "as a result of Chronic Fatigue Syndrome." Compl. ¶ 10.

denied because Hartford determined, based on the substantial medical and surveillance evidence in the file, that Jacoby was capable of performing sedentary work.

Following an administrative appeal, Jacoby filed this lawsuit under ERISA. The Plan provides Hartford with complete discretion to determine a claimant's eligibility for benefits. Therefore, Hartford's decision to deny Jacoby's claim is governed by an arbitrary and capricious standard of review. As discussed in detail herein, summary judgment is appropriate for Hartford because the substantial evidence in the administrative record, including opinions from four independent medical examiners and surveillance video capturing Jacoby's physical activities, demonstrated that Jacoby was not disabled under the terms of the Plan.

Indeed, this is a case in which Jacoby's claim is supported by her subjective and/or self-reported symptoms, with no objective evidence demonstrating that she is disabled. Although Jacoby's claim is supported by her treating physicians, who have accepted her self-reports, their opinions are in conflict with the independent and well-credentialed physicians and neuropsychologist who reviewed her records. Hartford was free, under the well established law of ERISA, to resolve the conflict and side with the independent doctors who reviewed the file, considered all the evidence, and provided well-reasoned and detailed reports. Accordingly, based on the substantial evidence in the administrative record, Hartford's decision to deny Jacoby's claim for continuing long term disability benefits was reasonable and not arbitrary or capricious.

## STATEMENT OF FACTS[2]

In cases under ERISA, such as the instant matter, which are governed by an arbitrary and capricious standard of review, the evidence is limited as a matter of law to that contained in the administrative record. *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995) ("A

---

[2] In accordance with Local Rule 56.1, Hartford is also submitting a separate Statement of Undisputed Material Facts.

district court's review under the arbitrary and capricious standard is limited to the administrative record."); *McCauley v. First Unum Life Ins. Co.*, 2006 U.S. Dist. LEXIS 73093, *23 (S.D.N.Y. Oct. 5, 2006) (same). In order to determine whether Hartford acted arbitrarily or capriciously, the Court must assess, based on the evidence in the record, whether the decision of Hartford "was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995). As the facts set forth herein will demonstrate, the decision of Hartford was reasonable and supported by substantial evidence.

## I.    The Terms of the Plan Include Those Set Forth In The Group Policy Issued By Hartford.

The Plan provides, among other things, long term disability ("LTD") benefits pursuant to the terms and conditions of the group insurance policy issued by Hartford which, at least in part, funds the Plan. The definition of "disabled" is set forth in the Plan, in pertinent part, as follows:

> Disability or Disabled means that during the Elimination Period and for the next 36 months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy,
>
> from performing one or more of the Essential Duties of Your Occupation, and as a result your Current Monthly Earnings are no more than 80% of your Indexed Pre-Disability Earnings.
>
> After that, you must be so prevented from performing one or more of the Essential Duties of Any Occupation.
>
> ************************************************
>
> Any Occupation means an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance.

HAR POLICY 025-26.[3]

Under the Plan, Hartford has the discretionary authority to decide whether a claimant is entitled to LTD benefits. This is evidenced by the following provision, which is contained in the policy:

> We [Hartford] have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

HAR POLICY 041.

## II. The Claim File Contains Jacoby's Pertinent Medical History And There Is Substantial Record Evidence Supporting The Decision Of Hartford That She Was Not Totally Disabled.

In evaluating Jacoby's claim, Hartford compiled a voluminous 1845-page record which, among other things, contains numerous medical records from Jacoby's health care providers; documents and notes relating to interviews of Jacoby and her treating physicians; surveillance records; written statements from Jacoby; and numerous narratives and other submissions from Jacoby and her attorneys. In addition, the record contains four independent medical reviews from three physicians and a neuropsychologist, and a vocational assessment.

### A. Jacoby was employed as an Executive Assistant for GSCP.

Jacoby started working as an Executive Assistant for GSCP on February 26, 2002, and ceased working nine months later on December 20, 2002. HAR1278. The Executive Assistant position was sedentary in nature and required continuous sitting. HAR1279. Jacoby's primary job duties were answering phones, typing correspondence, and scheduling meetings and travel for two executives. HAR1280.

---

[3] "HAR Policy ___," "HAR___," and "HAR SIU ___" refer to the bates-numbered pages of the administrative record which has been submitted to the Court under seal and which is identified as **Exhibit A.** The entire administrative record has been authenticated by the Declaration of Jeffrey C. Small, which is attached as **Exhibit B.**

**B.**    **Jacoby began seeing Dr. Susan Levine in September 2002.**

Jacoby first received treatment for her complaints of extreme fatigue in September 2002 from Dr. Susan Levine, an internal medicine physician.  HAR363-366.  Dr. Levine's early office notes reflect that Jacoby claims to have been "ill for many years" with fatigue, but it became worse following a laparoscopy in September 2001 and continuing thereafter.  *Id.*  Jacoby also reported symptoms of dizziness, lightheadedness, vertigo, palpitations, flushing, headaches, chemical sensitivities, and short term memory loss.  *Id.*  Dr. Levine recommended that Jacoby undergo numerous physical and neurocognitive tests to determine the cause of Jacoby's stated symptoms.  *See* HAR673 (where an independent physician stated that Dr. Levine had ordered "most every immunological test known to man").

On October 21, 2002, Dr. Levine sent Jacoby to have a Tilt Table Study done to help determine the cause of the fatigue and dizziness.[4]  HAR1211-12.  The test was initially negative, but after being given "Isoprotenerol," Jacoby had a "vasovagal response to upright tilt," meaning that she became lightheaded during the test indicating a possible change in blood pressure.  *Id.*  Jacoby was advised simply to add "salt and water" to her diet to address this reaction.  HAR361.  There is nothing in the file which explains how this test demonstrated that Jacoby was in any way disabled.

On October 31, 2002, Jacoby had an MRI of her brain in an effort to attempt to determine the cause of her claims of headache and vertigo.  HAR1217.  The MRI identified a 10 millimeter "abnormal signal focus in the right periatrial white matter without enhancement or mass effect."

---

[4] The tilt table study is used to evaluate patients who have experienced loss of consciousness, referred to as a "syncope."  In a tilt table study, the patient is strapped to a table, which is then mechanically tilted to an upright position. While monitoring the pulse, blood pressure, electrocardiogram, and sometimes blood oxygen saturation, the patient is left in a standing position for 20 to 30 minutes. For patients who experience a "vasovagal syncope" during the test, the cardiovascular adjustment to an upright tilt does not function normally.  *See* http://heartdisease.about.com/cs/syncope/a/tilttabltesting.htm for further information about tilt table testing.

*Id.* This finding was "considered non-specific," and the report expressly stated: "Otherwise, normal study." *Id.*

On November 6, 2002, with no test results to support the cause of Jacoby's subjective complaints, and after less than two months of treatment, Dr. Levine diagnosed Jacoby with Chronic Fatigue Syndrome ("CFS"). HAR362. There is no evidence in the medical records to show how Dr. Levine arrived at this diagnosis, other than her office notes recording Jacoby's continuing reports of fatigue.[5] *Id.*

After the slightly abnormal results of the MRI, Dr. Levine recommended on November 6, 2002, that Jacoby consult with a neurologist because it was "not clear" to Dr. Levine "what a parietal lesion is." *Id.* Following this neurological consultation, on November 13, 2002, Dr. Levine reported that while Jacoby had an "abnormal MRI of the Brain which showed a small parietal lesion," *her neurological exam was "normal."* HAR361 (emphasis added).[6] Also in this November 13 visit, Jacoby requested "a note" to enable her to apply for disability. *Id.* At around this same time, Dr. Levine also reported that Jacoby had a growth hormone deficiency and identified trigger points across Jacoby's back which were based on Jacoby's reports of pain. HAR360. Dr. Levine found these trigger points consistent with a possible diagnosis of fibromyalgia. *Id.*

On December 3, 2002, Dr. Levine sent Jacoby to have a Brain SPECT Scan to assess the cause of her self-reported complaints of dizziness and memory loss.[7] HAR368-369. The SPECT

---

[5] There are no diagnostic tests for chronic fatigue syndrome. It is only diagnosed by ruling out other possible causes of fatigue. *See* http://www.webmd.com/chronic-fatigue-syndrome/chronic-fatigue-syndrome-topic-overview.

[6] In a subsequent office note from December 2002, Dr. Levine confirmed that the MRI results reflected a "non-clinically significant abnormality." HAR360.

[7] A SPECT (single-photon emission computed tomography) brain scan is a diagnostic nuclear medicine imaging procedure that permits physicians to visualize brain function by obtaining three-dimensional images of the brain. Brain SPECT is a way for physicians to see how blood is flowing through different areas of the brain and to detect any abnormalities. *See* http://www.amershamhealth-us.com/patient/diaguide/spect.html for more information.

scan showed a pattern of "mild to moderate" diffuse heterogeneous hypoperfusion involving the

frontal, parietal, and temporal lobes. *Id.* A "mild degree" of white matter disease was also noted.

The hypoperfusion was reported to be "non-specific and can be seen with a variety of

encephalopathies, including encephalitis (Lyme disease, etc.), vasculitis, or chronic

medication/drug use." *Id.* Again, as noted later by an independent physician, the results of the

SPECT Scan were not related to any of the subjective complaints that Jacoby claimed was

disabling her. HAR548, 791.

### C.    In December 2002, Dr. Levine referred Jacoby to an endocrinologist in search of an explanation for her symptoms.

Dr. Levine referred Jacoby to an endocrinologist, Dr. Dennis Gage, in December 2002, to

assess other possible causes of Jacoby's claims of fatigue and to evaluate the apparent growth

hormone deficiency. HAR360, 1141. In a December 9, 2002 letter to Dr. Levine, Dr. Gage

stated that Jacoby appeared to have a "blunted growth hormone" and recommended thyroid

testing and a pituitary MRI to rule out an adrenal insufficiency. HAR1141. This MRI of the

pituitary gland was performed the following day. HAR1137-38. The MRI demonstrated that the

pituitary gland was "considered normal." *Id.*

### D.    Dr. Levine referred Jacoby to a psychologist in November 2002.

In November 2002, Jacoby was next referred to a psychologist, Anna Rosen Noran, Ph.D.,

for evaluation, testing and psychotherapy for Jacoby's claims of "long-standing, debilitating

depression" and functioning deficits. HAR1030. Jacoby apparently visited Dr. Noran on

numerous occasions in late 2002 and early 2003. *Id.* Dr. Noran issued a final written report on

February 23, 2003, and described Jacoby's reported complaints as: anxiety, insomnia, poor

memory, inability to concentrate, excessive rumination, dizziness, and extreme lethargy. *Id.* Dr.

Noran diagnosed Jacoby as having Major Depression Recurrent Severe without Psychotic

Features and Attention Deficit Disorder, as well as Mixed Personality Disorder. *Id.* There is no indication that any further treatment was recommended by Dr. Noran. *Id.*

### E. Jacoby ceased working in December 2002 and filed a claim for LTD benefits, which Hartford approved in September 2003.

Based on the diagnosis of CFS, Jacoby ceased working on December 20, 2002, due largely to her claims of fatigue. HAR1295-1296. She submitted her LTD claim application in May 2003 and submitted Attending Physician Statements from Dr. Levine and Dr. Derek Enlander (internal medicine), a physician who had only started treating Jacoby in January 2003. HAR1293-96. Both physicians placed restrictions and limitations on Jacoby's ability to work. *Id.* For example, both physicians restricted Jacoby to standing and walking only for 10-15 minutes at a time, sitting for only 30 minutes, and carrying no more than 10 pounds. *Id.*

Based on the medical records submitted to Hartford and the restrictions and limitations placed on Jacoby by her treating physicians, Jacoby's claim for LTD benefits was approved by Hartford on September 25, 2003. HAR64-66. The approval letter informed Jacoby that, as of June 21, 2006, she would need to establish that she was prevented from performing the duties of "any occupation," in accordance with the terms of the Plan. *Id.*

### F. Jacoby continued to undergo testing and receive treatment in 2003-2004, none of which provided any objective explanation for her claimed symptoms.

In June 2003, Jacoby underwent another MRI of her brain. HAR917-18. This MRI again showed a 10 millimeter linear hyperintense signal focus within the right periatrial white matter, which was unchanged from the MRI of October 30, 2002. *Id.* The report confirmed that: *"Again, this is considered a non-specific finding. The remainder of the study is normal."* *Id.* (emphasis added). In a June 23, 2003 office note of Dr. Levine, she wrote that Jacoby "reports daily fatigue, musculoskeletal pain, headaches, sleep disturbances, mild anxiety all contributing to her inability to function predictably." HAR353.

Between October 9, 2003 and July 28, 2004, a period of almost ten months, Jacoby did not see Dr. Levine. Her visits to Dr. Levine, however, resumed on a monthly basis following July 2004. HAR348. In July 2004, Jacoby was also evaluated by Dr. Richard Podell (integrative medicine specialist) who determined in conclusory fashion that Jacoby was completely unable to perform any activity because Jacoby had "limited stamina" and "pushing limits causes prolonged worsening." HAR997-99. Dr. Podell performed no objective testing on Jacoby and simply accepted what she told him about her subjective symptoms. HAR SIU 062.

In September 2004, Jacoby was sent for yet another MRI of her brain. HAR906. The MRI again provided no explanation for her symptoms, as the report showed that "there is a small, non-specific right periventricular white matter lesion. In this age group, this is an entirely *nonspecific lesion*. There is *no abnormal enhancement or mass effect*." *Id.* (emphasis added).

Jacoby was also sent for second brain SPECT Scan on October 6, 2004. HAR370-71. The written report noted that "there is again patchy decreased activity involving portions of the temporal and parietal lobes, again more marked at the parietal lobe regions bilaterally." *Id.* As before, no significant abnormalities were noted. Indeed, the report stated there was improvement over the December 2002 scan. *Id.*

Dr. Levine also referred Jacoby to Dr. Alexander Mauskop for a neurological consultation to assess Jacoby's complaints of insomnia, blurred vision and fatigue. HAR894. In a December 14, 2004 letter to Dr. Levine, Dr. Mauskop noted that Jacoby's "mental status was normal, including orientation in time place and person, recent and remote memory, normal attention, concentration, language and fund of knowledge." *Id.* Dr. Mauskop also observed that Jacoby's "motor testing showed normal strength and tone without atrophy and diffuse muscle

tenderness...Gait was normal and tandem gait was performed well. Romberg test was normal."
*Id.*

G.    **In January 2005, Dr. Podell prepared a second physical capacities evaluation based on what Jacoby reported.**

Dr. Podell completed another Physical Capacities Evaluation Form in January 2005, in which he noted that Jacoby could sit one hour at a time for 2 hours a day; stand 15 minutes at a time for less than an hour a day; walk 2 minutes at a time for 15 minutes a day and had maximum work capability of less than 2 hours a day. HAR949-50. Again, Dr. Podell performed no objective testing and simply accepted what Jacoby reported. HAR SIU 062. Indeed, at no time did Jacoby undergo any functional capacity testing. HAR548.

H.    **Jacoby reported in July 2005 that she was too weak to engage even in telephone conversations.**

No objective testing was explaining Jacoby's symptoms and she continued to be seen by Dr. Levine in 2005. HAR329-339. In July 2005, Jacoby submitted a Claimant Questionnaire form to Hartford in support of her claim for continuing LTD benefits. HAR921-27. In the narrative, Jacoby stated that she had CFS and Fibromyalgia. HAR923-25. She described her symptoms as fatigue; vision disturbances; sensitivity to light, touch and sound; dizziness; and memory and cognitive impairment. HAR923. Jacoby stated that she was unable to engage even in telephone conversations because "it is too taxing to not only get to the phone but also to hold on to it for more than a few minutes at a time due to fatigue, pain. . . weakness." *Id.* Jacoby also said it was "difficult to converse due to the complexities involved in following the conversation." *Id.* Jacoby wrote that she was easily fatigued by even simple tasks, such as brushing her hair, walking, wiping down counters, or doing laundry. *Id.*

Dr. Levine submitted a Physical Capacities Evaluation form dated August 1, 2005, in which she noted that Jacoby could only sit, stand, or drive for 30 minutes at a time, and could

only walk for 15 minutes at a time. HAR873-74. Dr. Levine also stated that Jacoby could *never* climb, balance, stoop, kneel, crouch or crawl. *Id.*

> **I.** **Hartford conducted video surveillance of Jacoby in late 2005 which revealed that her restrictions and limitations had been substantially overstated.**

In connection with its evaluation of Jacoby's eligibility for continuing long term disability benefits, Hartford conducted random video surveillance of Jacoby on a few days in the Fall of 2005. HAR824-34. On September 13, 2005, Jacoby was observed exiting a vehicle, walking, carrying a bag and beverages, ascending steps, and entering her residence. *Id.* Jacoby appeared to ambulate in a normal manner without restrictions or the use of visible medical devices. *Id.*

On December 6, 2005, Hartford again conducted surveillance on Jacoby. HAR817-823. On that day, Jacoby was observed engaging in numerous activities. HAR819-821. Jacoby drove her car to Dunkin Donuts where she parked, walked inside, exited carrying a tray with two or three cups of coffee, walked to her vehicle, put the tray on the trunk and bent over to sip the coffee, opened the driver's door with her right hand and knelt down to pick up something off the ground, quickly stood back up, got into her vehicle and drove away. HAR819-821, 790. Jacoby then drove to a neighbor's home and easily exited the vehicle. HAR820, 790. After leaving her neighbor's home, Jacoby drove back to her residence, exited the vehicle while carrying the tray of coffee and went inside. HAR820.

Shortly thereafter, on that same day, Jacoby drove to an A&P Supermarket, walked inside, and then exited pushing a shopping cart with six bags of groceries. HAR820, 790. Jacoby walked to her vehicle, opened her trunk, bent at the waist to move items around in the trunk, *lifted each bag* out of the cart into the trunk, closed the trunk and rapidly pushed the cart back to

the store. *Id.* Jacoby then walked back to her car *carrying another bag of groceries*, put the bag

in the back seat and drove away. *Id.*

Less than one hour later, Jacoby drove to a "Vitamin Shoppe" store, parked, and walked

inside. HAR821. She left the store carrying a small bag, got into her vehicle and drove to a

Macy's store in a shopping mall. *Id.* Jacoby parked her vehicle and walked into Macy's where

she remained for 35 minutes. *Id.* Jacoby walked out of Macy's carrying two large shopping

bags and her purse. *Id.* Jacoby walked to her car and put the bags in the back seat. *Id.* Jacoby

drove away and surveillance terminated. *Id.*

On December 7, 2005, surveillance was again conducted. HAR821. On that day, Jacoby

was observed driving her car to a bank and proceeding through the "drive-thru." HAR822.

Approximately one hour later, Jacoby was observed driving east on Route 80 to the George

Washington Bridge to Route 95 North through the Bronx and into Connecticut. *Id.* Surveillance

was terminated for lack of fuel after Jacoby was observed driving for 2 hours and nine minutes

consecutively. *Id.* Later, Jacoby admitted that she had driven three hours to Westfield, MA.

HAR791.

During the entire surveillance, Jacoby "ambulated with a normal non-antalgic gait with

normal stride and cadence and did not use any assistive devices for ambulation." HAR791.

Jacoby appeared to be "of normal weight and was fit appearing, with normal strength, ROM

[range of motion] and flexibility, and showed no signs of fatigue or discomfort while shopping,

loading groceries into her trunk, bending at the waist and driving for extended periods." *Id.*[8]

---

[8] These were observations of Dr. William Sniger, a board-certified physical medicine and rehabilitation physician, after reviewing the video. HAR791-792. Dr. Sniger is an independent, non-Hartford employed physician whose *curriculum vitae* is attached as **Exhibit C**.

**J.      In January 2006, Jacoby began to see Dr. Ritchie Shoemaker of the "Chronic Fatigue Center."**

In January 2006, Jacoby also began to see Dr. Ritchie Shoemaker, a physician in Maryland who had an office called the "Chronic Fatigue Center." HAR283, 274. The medical records reflect that Jacoby saw Dr. Shoemaker in January 2006, March 2006 and November 2006. HAR283-87. Dr. Shoemaker ordered a battery of blood tests for Jacoby in January 2006. HAR289-311. Abnormal results were only reflected in a couple of assays, i.e. MSH, C4a (a protein), VIP (plasma), and cholesterol. *Id.* As set forth on the lab reports, however, the MSH and VIP tests were "investigational" and "for research purposes only," not to be used "as a diagnostic procedure without confirmation of the diagnosis by another medically established diagnostic product or procedure." *Id.* As confirmed by an independent physician, the abnormal assays were not linked on any objective basis to the claimed symptoms of Jacoby. HAR547-48.

**K.      In March 2006, Jacoby gave statements to a Hartford investigator that were markedly inconsistent with the videotaped surveillance.**

On March 15, 2006, Jacoby was interviewed at her home for three hours by Investigator James W. Budkus of Hartford. HAR SIU 054-63; 113-115. Budkus observed that Jacoby "walked and moved throughout her home without any noticeable limitations or restrictions" and that her "movements appeared fluid and smooth, which is consistent with what was viewed during the activity check." HAR SIU114. Budkus also stated that he "did not observe any type of cognitive or concentration type difficulties during the interview process" and that Jacoby possessed "the ability to communicate, understand questions and instructions, and articulate her answers." *Id.*

Budkus asked Jacoby to prepare a "Continuing Disability Statement." HAR SIU 054-63. In this statement, Jacoby outlined her symptoms and impairments, including fatigue, chronic infections, back pain, cognitive memory disorder, hormonal imbalance, intestinal disorders,

dizziness, shortness of breath, and headaches. HAR SIU054. Jacoby identified her treating

physicians as Drs. Levine and Shoemaker. *Id.* Jacoby stated that she was "not able to do any

kind of work."

Budkus asked Jacoby to describe her physical restrictions and limitations, which she said

had not changed in the last six months. HAR SIU059. Indeed, Jacoby went so far as to say:

"During the past 6 months, I have not experienced a time when I could exceed the level of

functionality or be more active than I described above." *Id.* Jacoby's description, however,

presented an entirely different picture of her activities than those observed on the video

surveillance. Contrary to the activities seen on the video, Jacoby told Budkus:

- That she was only able to walk one block; her gait was slow to medium; and that after walking a block she had to sit or lie down. HAR SIU 056.

- That she was able to stand for only five minutes without "severe pain" in her neck, shoulders and lower back. *Id.*

- That if she twisted at the waist or turned her head she would experience a pain level of six. *Id.*

- That she could squat, but could not get back up without assistance. *Id.*

- That she could only bend forward about 30 degrees. *Id.*

- That she could drive only "twenty minutes before I have to stop and rest because of pain in lower back, shoulders and neck. I will have arm weakness and fatigue. Sometimes I will have cognitive issues. Sometimes I will get confused on where I am going. If I drive more than that, I experience heightened pain, weakness and fatigue." HAR SIU058.

Jacoby expressly confirmed these statements were true. HAR SIU 061.

After Jacoby provided the statements above, she was shown the video surveillance. HAR

SIU 062. Jacoby then provided another written statement. HAR SIU 062-63. Jacoby

acknowledged that: "I realize that some of these activities [on the video] exceeded the

restrictions and limitations outlined by my doctor, and what I have reported to [Hartford], but I was able to do those activities on those days because good days." HAR SIU 062.

### L.    Hartford's Case Manager performed an internal review and concluded that Jacoby could perform a sedentary job.

In June 2006, Hartford Medical Case Manager Johanna C. Cobb, RN, reviewed Jacoby's medical records and the surveillance video. HAR101-103. Nurse Cobb analyzed Jacoby's functional status and concluded that she was capable of performing full-time, seated work, which would require only brief or intermittent periods of standing and walking, allowed for full use of the upper extremities, and limited lifting and carrying to 0-10 pounds. HAR681-82. Nurse Cobb wrote to Dr. Levine and asked her to comment on this assessment and sent Dr. Levine a copy of the surveillance video to review. *Id.* Nurse Cobb also described the detailed observations of the investigators who surveilled Jacoby and expressly asked Dr. Levine to comment on the surveillance footage. *Id.* Dr. Levine responded by letter dated June 7, 2006:

> I strongly disagree with the assessment your company has made as to Ms. Jacoby's ability to function.  This patient is extremely debilitated with daily episodes of fatigue, malaise, musculoskeletal pain, headaches and cognitive problems....She is capable on occasion of performing some minor errands but she must rest in between and often 'pays' for a certain level of exertion the following day.  If she has, for instance, visited me in my office, she will often be debilitated and homebound for the following two days.  The documentation provided fails to take into account the patient's sore throats, low grade fevers, cognitive abilities, ability to change position and other necessary adjustments.  She continues to have only limited ability to perform activities, including lifting and carrying (the weight of her grocery bags was not available).  And once again, the impact of her physical activities, according to the videos was not available for the day afterwards.

HAR313-14. Surprisingly, and tellingly, Dr. Levine did not even look at the video surveillance. HAR789.

**M.    In June 2007, Hartford submitted Jacoby's medical records for two independent physician reviews.**

After receiving Dr. Levine's letter, Nurse Cobb referred Jacoby's medical records for an independent peer review. HAR100. On June 27, 2006, Hartford obtained an independent medical records review from Richard Levy, M.D., who is Board Certified in Neurology and was provided by the Medical Advisory Group, L.L.C. HAR673-75.[9] Dr. Levy reviewed Jacoby's medical records, including those of Dr. Levine. *Id.* Dr. Levy wrote that Dr. Levine "did most every immunological test known to man. Screening tests for various infectious agents, autoimmune diseases, and any other chronic illness were obtained and have been normal. A tilt-table test did reveal a drop in blood pressure. A SPECT scan of the brain revealed some nonspecific frontal abnormalities. An MRI of the brain revealed one area of increased signal intensity measuring about 10 mm and again this is totally nonspecific and not characteristic of multiple sclerosis or other specific disorders." *Id.* Dr. Levy found "that all of the objective testing done really revealed no specific findings and the patient has an unremarkable objective physical examination." *Id.* Dr. Levy spoke with Dr. Levine about Jacoby's medical condition, and he reported that Dr. Levine acknowledged that "nothing really was objectively abnormal and specific to the diagnosis, but she kept saying that she felt that the patient's complaints were valid and she could not work. Basically, she was accepting the patient's subjective testimony or declaration that she had an array of symptoms and was therefore disabled." HAR674. Dr. Shoemaker refused to speak with Dr. Levy. *Id.* In conclusion, Dr. Levy opined: "it is my medical opinion with a high degree of certainty that Julie Jacoby is not precluded from performing full time work. There is no evidence of any specific physical impairment that requires any particular workplace restriction." *Id.*

---

[9] Dr. Levy is a graduate of Yale University and Dartmouth Medical School, and his *curriculum vitae* is attached as **Exhibit D**.

Hartford also obtained an independent medical records review from William Sniger, M.D., who is Board Certified in Physical Medicine and Rehabilitation and Spinal Cord Injury Medicine. HAR785-92.[10] In his detailed July 12, 2006 report, Dr. Sniger confirmed that he reviewed Jacoby's medical records and the surveillance video, and attempted to speak with her physicians in order to determine her work capacity and any necessary restrictions and limitations. HAR785-89. In a telephone conference with Dr. Levine, she acknowledged to Dr. Sniger that she had not viewed the surveillance video, but maintained her opinion that Jacoby does not have full-time work capacity due to her "subjective complaints of fatigue." HAR789. Dr. Shoemaker refused to speak with Dr. Sniger. *Id.*

In his written report, Dr. Sniger stated that Jacoby "has undergone an extensive workup with no significant findings." HAR791. Dr. Sniger then analyzed each objective test that Jacoby had undergone and opined that each one had "normal" or unremarkable findings. *Id.* In regard to the 2002 "[t]ilt table test," Dr. Sniger noted that it was "reportedly positive for symptoms following isoproterenol injection, but was negative without." *Id.* In addition, Dr. Sniger found that the "Brain MRI & SPECT have remained stable with nonspecific findings." *Id.* Dr. Sniger also found that Jacoby's psychological evaluation was positive for Axis I and II disorders, "suggesting a psychological component to her symptoms." *Id.* Dr. Sniger concluded that "the preponderance of objective information does not appear to support the severity of the claimant's myriad subjective symptoms or alleged inability to perform full-time work....I recommend the following restrictions: Lifting/carrying of at least 10 pounds occasionally; reaching frequently, sitting, feeling and handling constantly; opportunity to change positions as needed. No other restrictions are indicated." HAR792.

---

[10] As mentioned, Dr. Sniger's *curriculum vitae* is attached as Exhibit C.

Based on the restrictions and limitations recommended by Dr. Sniger, Hartford obtained an Employability Analysis Report to assess Jacoby's functional work capacity. HAR661-67. The July 25, 2006 report prepared by Christina M. Fleisher, Rehabilitation Clinical Case Manager, found that Jacoby's "physical demand level remained at sedentary" and that she "possesses transferable skills required to perform her own occupation as an Executive Assistant." *Id.*

### N.    On August 11, 2006, Hartford denied Jacoby continuing LTD benefits.

On August 11, 2006, Hartford notified Jacoby that her claim for continuing long term disability benefits was denied. HAR485-91. The letter summarized the pertinent medical records, as well as the Physical Capacities Evaluations of Dr. Levine and Dr. Podell. *Id.* The letter outlined the findings on the surveillance video, and described some of the inconsistencies between Jacoby's stated limitations and the observation of her actual activity level. HAR488-489. For example, Jacoby said she could not bend or flex forward 30 degrees without vertigo and pain, but she was seen on the video bending 90 degrees with no difficulties. Jacoby said she could not squat without pain and assistance getting back up, but she was observed squatting and standing without difficulty. Jacoby said she could drive no more than 20 minutes, but she was observed driving non-stop for at least 2 hours and 9 minutes. And Jacoby said she could stand only for 5 minutes, and the video demonstrated this was not accurate. *Id.*

Based on the file review, Hartford concluded that Jacoby was capable of performing the duties of an administrative secretary or executive assistant. *Id.* Therefore, Jacoby was no longer deemed disabled. *Id.*

**O.    After receiving the denial letter, Jacoby sought a neuropsychological evaluation.**

After receiving the denial letter and its assessment of her physical limitations, Jacoby underwent a neuropsychological evaluation on October 16, 2006 by Dr. Leo Shea and Dr. Judith Leventhal.  HAR222-37.  The evaluation consisted of an interview with Jacoby and a battery of testing, including the Wechsler Adult Intelligence Scale III (WAIS-III) test, the Wechsler Individual Achievement Test, the Nelson-Denny Reading Test, the Wechsler Memory Scale-III test, and the Watson-Glaser test.  HAR225.  As demonstrated by the record, many of the assessments and conclusions reached in the evaluation were based on a false premise concerning Jacoby's prior level of academic and intellectual achievement.  HAR225, 557.  As noted later by an independent neuropsychologist, the evaluators premised some of their analysis on the erroneous assumption that Jacoby graduated from Montclair State College in 1989 with a 3.9 average.  HAR225, 557-58.  Indeed, there are numerous references by the evaluators to test scores that are "not commensurate with [Jacoby's]. . . prior level of academic achievement."  *See, e.g.,* HAR228, 229, 232.  In fact, Jacoby, in her personal profile, revealed that "my highest level of education is an Associate's degree in Communications.  I received my degree from County College of Morris."  HAR SIU060.

The tests results demonstrated primarily average cognitive abilities.  *Id.*  For example, the evaluators found that Jacoby's "overall intellectual functioning as measured by the [WAIS III] is in the Average range with a Full Scale IQ score of 100 at the 50th percentile.  The Full Scale I.Q. is the aggregate of the Verbal and Performance scores and is *usually considered the most representative measure of global intellectual functioning*."  HAR225 (emphasis added).  Nevertheless, the evaluators also said there were certain "neurocognitive weaknesses and compromised functioning...in perceptual organization, speed of information processing, visual

19

attention and concentration especially under distracting conditions, working memory, auditory

and visual memory and reading comprehension." HAR232.  Based on these "weaknesses," the

evaluators opined that "it can be projected from the data that Ms. Jacoby will not be able to meet

the responsibilities and obligations necessary to assume her executive assistant job

responsibilities given the level of her current deficits."  HAR233.  Again, however, the

conclusions were, at least in part, based on assumptions about Jacoby's "innate intelligence" and

prior academic success.  *See* HAR232-233 (where the evaluators' summary is replete with

references to:  Jacoby's impaired ability "to perform at a level commensurate with her innate

intellectual ability;" her "High Average to Superior intellectual ability compatible with her

educational history;" and her "level of success in college" could not have been obtained based on

her performance in this evaluation).  Moreover, contrary to the documented prior findings by Dr.

Noran of "longstanding debilitating depression" and a personality disorder [HAR1030], the

evaluators stated:

> It is concluded on the basis of this evaluation that Ms. Jacoby's cognitive
> decline is organically-based and compatible with the brain SPECT studies
> showing frontal, parietal and temporal lobe abnormalities.  There is no
> evidence of a personality or mood disorder that might help to account for
> the documented cognitive changes.  Prior to 2002, Ms. Jacoby was living a
> productive life and functioning at a high level commensurate with her
> innate intelligence.  Her disability is causally related to the decline she has
> been experiencing since 2002 that has a well-documented organic basis.

HAR233.

**P.    Jacoby appealed the denial decision and submitted additional evidence.**

On February 9, 2007, Jacoby appealed the denial of her claim for LTD benefits.

HAR205-21.  In addition to an appeal letter from Jacoby's attorney, she submitted letters from

Dr. Shoemaker, Dr. Benjamin Natelson (Neurologist), her mother, and Jacoby's own affidavit.

*Id.*  Jacoby also provided updated medical records, as well as the neuropsychological evaluation

discussed above.  *Id.*

Dr. Shoemaker's December 29, 2006 letter opined that Jacoby was "permanently disabled for all occupations." HAR274-82. This letter is permeated with Dr. Shoemaker's bias against insurance companies, as he referred to the surveillance as "concealed spying;" he accused Hartford of considering Jacoby a "fabricating" "liar;" he erroneously stated that Dr. Sniger was an employee of Hartford who could not be "independent;" and that Hartford was a "mammoth company" without regard for the "individual persons it insures." HAR274, 275, 282. Dr. Shoemaker refused to speak with Dr. Sniger because Jacoby "instructed me not to speak with any persons associated with her case from the Hartford." HAR275. In a statement further casting doubt on Dr. Shoemaker's report, he stated, in support of his finding of disability, that Jacoby had a "peculiar uncontrollable contraction of her fingers and toes that present with a 'claw hand deformity.'" HAR276. This statement completely contradicts Jacoby's statement that she had "full use of my hands and fingers." HAR SIU 057.

Dr. Natelson, of the "Chronic Fatigue Syndrome/Fibromyalgia Center," wrote a letter dated January 16, 2007, in which he stated that he examined Jacoby on October 24, 2006. HAR383-84. Dr. Natelson wrote that Jacoby's "general examination was *normal* except the patient did have 16 of 18 tender points; this is consistent with her fulfilling the case definition for fibromyalgia." *Id.* (emphasis added). Dr. Natelson stated that Jacoby's "*[n]eurological examination was within normal limits* except for her inability to do a tandem Romberg." HAR383. Dr. Natelson's "impression on intake" was that Jacoby had CFS, fibromyalgia and major depressive disorder (which the neuropsychological report had denied). *Id.* Dr. Natelson concluded that Jacob was physically disabled, which was compounded by moderate major depressive disorder. HAR384. "This combination of symptoms makes it impossible for her to work, even on a part-time basis." *Id.*

**Q.    Hartford obtained two additional independent medical reviews on appeal.**

In connection with Jacoby's appeal, Hartford obtained two additional independent

medical reviews.  First, Hartford obtained a neuropsychological review from Pedro Garrido-

Castillo, Ph.D., an independent consulting neuropsychologist provided by the University

Disability Consortium.  HAR551-63.[11]  Dr. Garrido-Castillo focused his review on the

neuropsychological and psychiatric aspects of Jacoby's file.  HAR551.  In regard to Jacoby's

psychological function, Dr. Garrido-Castillo observed that, although there were numerous

references to Jacoby suffering from depression and anxiety, the only medication that she was

taking was an herbal supplement, St. John's Wort.  HAR552.  In addition, Dr. Garrido-Castillo

noted that the testing reports of (1) Dr. Noran and (2) Drs. Shea and Leventhal showed

significant areas of disagreement regarding Jacoby's cognitive complaints.  HAR561-562.  In Dr.

Noran's report dated March 23, 2003, she stated that Jacoby suffered from "major depression, a

mixed personality disorder and 'attention deficit disorder'," which contributed "significantly" to

her physical limitations.  HAR561.  Drs. Shea and Leventhal suggested, however, in their report

that Jacoby "had no depression and there was no evidence of a personality disorder."  *Id.*

Dr. Garrido-Castillo conducted an extensive review of Drs. Shea and Leventhal's

neuropsychological evaluation, which consisted of testing general intellectual functioning,

memory functioning and tests of educational achievements, executive functioning and effort.

HAR556.  Dr. Garrido-Castillo reviewed the results of the WAIS-III test, in which Jacoby tested

at a full scale IQ of 100 (in the 50th percentile).  HAR557.  Jacoby's verbal comprehension index

was 110, which is "high average;" her perceptual organization index was 91, which is "average;"

her working memory index was 91, which is "average;" and her processing speed was 106,

which also is "average."  HAR557.  Dr. Garrido-Castillo observed that, although the examiners

---

[11] Dr. Garrido-Castillo's *curriculum vitae* is attached as **Exhibit E.**

noted that Jacoby's "problem-solving ability did not seem commensurate with her intellectual ability and reflected a cognitive decline," "this opinion is based on the assumption that the claimant had premorbid intellectual functioning in the superior to very superior range," which had not been established. HAR558.

On the WMS-III working memory index, Jacoby scored in the 39th percentile, with subtest scores ranging from the 25th to 50th percentile. *Id.* "Thus, her performance was entirely within the average range with some tests being precisely in the middle of the average range and others somewhat below." *Id.* Although Drs. Shea and Leventhal concluded that Jacoby would be unlikely to meet job responsibilities based on this level of working memory, Dr. Garrido-Castillo found that "this conclusion is not warranted given that there are no significant deficits associated with this performance," which was "an entirely normal performance." HAR550.

Overall, Dr. Garrido-Castillo concluded that Drs. Shea and Leventhal's reports indicated that Jacoby's "current level of functioning is from average to high average in the verbal domain." HAR561. Although the report noted a "relative" weakness in Jacoby's working memory, her performance working memory tasks were within the 37th percentile, "which is entirely within the normal range." HAR561. In addition, while Jacoby did seem to have difficulty with verbal rote learning and aspects of complex visual memory, "this is suggestive of problems with organization rather than an essential memory disorder." HAR561-62. Finally, Jacoby's performance on the executive functioning test was mixed, but generally within normal limits. HAR562.

Dr. Garrido-Castillo wrote: "Based on the information reviewed, I conclude that the claimant's current level of neuropsychological functioning does not preclude her returning to work.... *Id.* Dr. Garrido-Castillo concluded:

In sum, the claimant presents with generally well-preserved neuropsychological functioning. Her verbal functioning is significantly better than her nonverbal functioning. However, within both domains she remains within the average range. There are some difficulties with some areas of cognitive functioning related to deficiency of processing information and also with respect to her ability to handle relatively complex information. I do not believe that the extent of these deficits is significant to preclude the claimant from returning to work on the basis of her psychological and neuropsychological functioning.

*Id.*

Hartford also obtained another independent medical records review from Dr. Jerome Siegel, who is Board Certified in Internal Medicine and Occupational Medicine. HAR534-50.[12] Dr. Siegel provided a detailed 16-page report, outlining and analyzing the medical records in the file, including the objective test results. *Id.* After reviewing the records, Dr. Siegel stated they demonstrated that Jacoby's subjective complaints far outweighed any objective problems found through physical examination, laboratory, or imaging studies. HAR547. Dr. Siegel found:

Although there are some subtle abnormalities noted on laboratory testing as noted in Dr. Shoemaker's reports, these are of unclear clinical significance in Ms. Jacoby's case. Ms. Jacoby had many laboratory tests performed, some of which are performed primarily as part of research data. Laboratory results found to be abnormal are not noted to be repeated on multiple occasions to exclude statistical error. Multiple laboratory studies have documented normal complete blood counts, normal serum chemistries, normal liver function studies, normal thyroid function studies, and no evidence of serious underlying connective tissue disease or neurologic abnormalities.

HAR547-48.

Dr. Siegel identified numerous inconsistencies between the limitations on Jacoby described in the medical records and Jacoby's actual demonstrated activities. *Id.* Dr. Siegel recognized that the medical records did document some abnormalities on neurological imaging studies, such as the SPECT scan and brain MRI, but there was no indication that Jacoby had a serious neurologic condition or disorder that would interfere with her ability to perform sedentary work. HAR548.

---

[12] Dr. Siegel's *curriculum vitae* is attached as **Exhibit F**.

In conclusion, Dr. Siegel found that "although the medical records document that Ms. Jacoby has been followed for several years related to chronic fatigue syndrome and multiple somatic complaints, her medical conditions should not interfere with her physical capabilities of performing sedentary-light physical demand work activities" with the restriction that she have a 0-10 pound lifting restriction, alternate sitting and standing, frequent rotation of job tasks and activities, and that she avoid prolonged sitting, standing or walking.  *Id.*

    **R.**    **On April 23, 2007, Hartford denied Jacoby's appeal.**

In a letter dated April 23, 2007, Hartford Appeal Specialist Edna R. Golych informed Jacoby that the decision to deny her claim for LTD benefits was upheld.  HAR568-82.  Hartford outlined the medical evidence in the file, including the additional information provided in support of the appeal, as well as the independent records reviews and surveillance information. *Id.*  Hartford provided a detailed 14-page, single spaced letter and concluded:  "Based on review of the documentation in the claim file, including surveillance material and Employability Analysis information as well as independent physician reviews, it appears that Ms. Jacoby is functionally capable of performing her own occupation which was at the sedentary level." *Id.* This lawsuit followed.

**ARGUMENTS**

**I.**    **The Decision Of Hartford To Deny Jacoby's Claim Is Evaluated Under An Arbitrary And Capricious Standard Of Review.**

As Jacoby herself concedes, the "disposition of this litigation, like many other ERISA Litigation Cases, may turn on the standard of review used by the Court." *See* Plaintiff's "Memorandum of Law in Support of Plaintiff's Motion to Declare the Arbitrary and Capricious Standard of Review Unconstitutional" at 3.  Indeed, where the terms of an employee benefit plan provide discretionary authority to the fiduciary to determine a claimant's entitlement to benefits

25

or to construe the terms of the Plan, the fiduciary's decision will be granted great deference and will be overturned only where the decision is arbitrary and capricious. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

In the Second Circuit, when a plan administrator has discretionary authority to determine eligibility for benefits or construe the terms of the plan, "judicial review of the adequacy of a claim decision is limited to determining whether the decision was arbitrary and capricious or an abuse of discretion." *See Guglielmi v. Northwestern Mutual Life Ins. Co.*, 2007 U.S. Dist. LEXIS 49182 (S.D.N.Y. July 6, 2007). Under this standard of review, a court may overturn the insurer's decision "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995); *see also Pulvers v. First Unum Life Ins. Co.*, 210 F.3d 89 (2d Cir. 2000) (same); *Gannon v. Aetna Life Ins. Co.*, 2007 U.S. Dist. LEXIS 72529 (S.D.N.Y. Sept. 28, 2007) ("Under the arbitrary and capricious standard, the court cannot question the plan administrator's decision except in the case of a 'clear error of judgment'.").[13]

Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and]...requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 73 F.3d 1066, 1072 (2d Cir. 1995); *see also Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003)

---

[13]  Jacoby may argue that because Hartford is the decisionmaker and the plan insurer, it operates under a conflict of interest and therefore its benefits decision requires a stricter standard of review by the Court. The law of the Second Circuit is clear, however, that the plaintiff has the burden to show not only the existence of a conflict of interest, but also that the "administrator was *in fact* influenced by the conflict of interest." *Pulvers*, 210 F.3d at 92 (quoting *Sullivan v. LTV Aerospace & Defense Co.*, 82 F.3d 1251, 1256, 1259 (2d Cir. 1996)); *McCauley v. First Unum Life Ins. Co.*, 2006 U.S. Dist. LEXIS (S.D.N.Y. Oct. 5, 2006) ("Nevertheless, a financial interest does not in and of itself create a conflict of interest for the plan administrator."). There is no evidence here that Hartford's decision to deny the claim was motivated by a conflict of interest, so the proper standard of review is arbitrary and capricious. *Id.; see also Guglielmi, supra* at *17 (finding that because the "plaintiff has failed to show that a conflict of interest in fact influenced the administrator's decision to deny him the benefits claimed, this Court's standard of review must remain highly deferential").

(same). Moreover, where both the administrator and the claimant offer "rational, though conflicting, interpretations..., the administrator's interpretation must be allowed to control." *Pulvers*, *supra* at 92-93. Thus, "the scope of review is narrow and 'highly deferential to a plan administrator' and 'the court may not upset a reasonable interpretation by the administrator'." *Fitzpatrick v. Bayer Corp.*, 2008 U.S. Dist. LEXIS 3532, *25 (S.D.N.Y. Jan. 17, 2008) (quoting *Jordan v. Ret. Comm. of Rensselaer Poly. Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995)).

In the present case, Hartford had clear discretionary authority to decide all questions regarding eligibility for benefits and to evaluate the evidence presented in support of benefit claims. Accordingly, the language of the Plan requires application of the arbitrary and capricious standard in regard to the decision by Hartford to deny Jacoby's claim for benefits. *See Pulvers*, 210 F.3d at 92.

## II.    Hartford Is Entitled To Summary Judgment Because Its Decision To Deny Benefits Was Supported By Substantial Record Evidence.

### A.    Jacoby Has The Burden Of Proving That Hartford's Decision Was Unreasonable.

In order to obtain disability benefits, Jacoby bears the burden to prove that the decision of Hartford was unreasonable, i.e. that it was not supported by substantial evidence. *See Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 441 (2d Cir. 2006); *Fitzpatrick , supra* at *27 ("the burden to demonstrate total disability by a preponderance of the evidence remains with the Plaintiff."); *Pava v. Hartford Life & Accident Ins. Co.*, 2005 U.S. Dist. LEXIS 41753 (E.D.N.Y. 2005) (granting motion for summary judgment and finding that "Plaintiff has failed to meet her burden to establish that Hartford was unreasonable in denying her claim for disability benefits"); *Ware v. Northeastern Vt. Reg'l Hosp.*, 2006 U.S. Dist. LEXIS 17170 (D. Vt. 2006) (granting the insurer's motion for summary judgment and finding "because there was more than a scintilla of evidence in the record to reasonably conclude that the plaintiff was able to continue to work, it

was not unreasonable for Unum to deny her claim"); *see also Brigham v. Sun Life of Canada,* 317 F.3d 72, 86 (1st Cir. 2003) ("The issue in this appeal is 'not which side we believe is right, but whether [the insurer] has substantial evidentiary grounds for a reasonable decision in its favor'.") (citations omitted); *Marx v. Meridian Bancorp, Inc.,* 2002 U.S. App. LEXIS 5277 (3d Cir. 2002) (noting that after the "own occupation period," eligibility for benefits "is assessed under a more stringent standard, one which requires [the plaintiff] to demonstrate that she is unable to perform any occupation for which she is qualified or may reasonably become qualified by training, education or experience"). Based on the substantial evidence in the administrative record, Jacoby cannot satisfy her burden here to show that Hartford's decision was arbitrary and capricious.

**B.    There Is Substantial Evidence In The Record That Jacoby Is Not Disabled From Working In Any Occupation.**

The sole issue in this case is whether Hartford's decision to deny Jacoby's claim for continuing LTD benefits was reasonable, *i.e.*, whether there was substantial record evidence to support the decision. *Pagan,* 52 F.3d at 442. Jacoby disagrees with Hartford's assessment that she was capable of performing sedentary work. "[D]isagreement, however, does not render...denial of benefits...arbitrary and capricious." *Kocsis v. Standard Ins. Co.,* 142 F.Supp. 2d 241, 253 (D. Conn. 2001). Indeed, where, as is the case here, there is substantial evidence in the administrative record supporting a denial decision, it should be upheld.

**1.    There is no objective evidence of a disabling condition that would render Jacoby unable to perform a sedentary occupation and the credibility of her subjective complaints of pain and fatigue are undermined by the record.**

Jacoby's claim of disability is based on her subjective complaints of pain, fatigue, and cognitive difficulties. To the extent there is objective evidence of anything out of the ordinary, it

consists of Jacoby's MRIs of the brain, the SPECT brain scan and certain laboratory tests. None of these demonstrate any significant abnormalities that would prevent Jacoby from working.

Although an MRI performed in October 2002 showed a 10 millimeter abnormal signal focus, this was deemed "non-specific" and the MRI was "otherwise normal." HAR1217. Moreover, not one of Jacoby's treating physicians ever opined how this "abnormal signal focus" would render Jacoby disabled. Indeed, Jacoby's neurological examination in November 2002 was "normal." HAR361. In September 2004, Jacoby was sent for another MRI of her brain. HAR906. This report again revealed "there is a small, non-specific right periventricular white matter lesion. In this age group, this is an entirely *nonspecific lesion*. There is *no abnormal enhancement or mass effect*." *Id.* (emphasis added). A subsequent neurological examination in December 2004 also confirmed that Jacoby's "mental status was normal, including orientation in time place and person, recent and remote memory, normal attention, concentration, language and fund of knowledge." HAR894-95.

A SPECT Scan in December 2002 scan showed a pattern of mild to moderate diffuse heterogeneous hypoperfusion involving the frontal, parietal, and temporal lobes, but the hypoperfusion was deemed to be "non-specific." HAR368-69. Jacoby had a second SPECT Scan in 2004 which demonstrated that "there is again patchy decreased activity involving portions of the temporal and parietal lobes, again more marked at the parietal lobe regions bilaterally," but there was improvement over the December 2002 scan. Again, none of Jacoby's treating physicians have ever tied this apparent "non-specific" abnormality to any disabling condition. Indeed, the evidence was to the contrary, as Dr. Sniger found that SPECT scan provided "no significant findings" and had "remained stable." HAR791.

Finally, Jacoby offers as objective evidence of her alleged disability certain laboratory

test results performed by Dr. Shoemaker in January 2006. These laboratory reports showed

normal blood count and serum chemistries, normal liver function, normal C-reactive protein, no

evidence of Lyme disease, and normal levels of anticaridiolipin antibodies, normal TSH, normal

tumor necrosis factor, normal level of MBP antibodies. HAR289-311. Abnormal results were

only reflected in a few assays, i.e. MSH, C4a (a protein), VIP (plasma), and cholesterol.

HAR289-311. As set forth on the lab reports, however, the MSH and VIP tests were deemed

"investigational" and "for research purposes only," not to be used "as a diagnostic procedure

without confirmation of the diagnosis by another medically established diagnostic product or

procedure." *Id.* Moreover, there is no evidence in the claim file that these abnormal results had

any significance for Jacoby's claimed inability to work. Indeed, as recognized by Dr. Siegel in

his report: "Dr. Shoemaker points out the low MSH, low VIP and high C4A levels. Dr.

Shoemaker, however, does not point [out] the research nature of some of these studies, or the

clinical significance of these studies, as regards correlation between ability for individuals with

low or high levels to return to work activities." HAR545.

Setting aside this scant objective evidence which has no causal connection to Jacoby's

claimed inability to work, all that is left are Jacoby's self-reported claims of pain, fatigue, and

cognitive difficulties. Under ERISA, however, "[i]t is hardly unreasonable for the administrator

to require an objective component" in proving a claim. *Maniatty v. UnumProvident Corp.*, 218 F.

Supp.2d 500, 503 (S.D.N.Y. 2003). Indeed, "[i]t is not unreasonable for an insurer to credit

objective evidence over subjective evidence." *Couture v. Provident Corp.*, 315 F. Supp.2d 418,

432 (S.D. N.Y. 2004); *see also Parisi v. UnumProvident Corp.*, 2007 U.S. Dist. LEXIS 93472,

**33-34 (D. Conn. 2007) (where "the denial of [the plaintiff's] disability claim was based on the

lack of objective medical evidence of [her] symptoms, or their affect on [her] ability to work, then such a denial would not be arbitrary and capricious.") As found recently in *Fitzpatrick v. Bayer Corp.*: "it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits....This is true even in cases in which the Plaintiff has been diagnosed with CFS and/or fibromyalgia." 2008 U.S. Dist. LEXIS 3532 at *33.

In light of the lack of objective evidence to support Jacoby's claim of disability, Hartford weighed the surrounding facts and circumstances in evaluating her subjective complaints of pain and fatigue. These complaints, however, were undermined by abundant evidence in the claim file, including the surveillance video and her interview by the Hartford investigator. *See Billinger v. Bell Atl.*, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003), *aff'd*, 124 Fed. Appx. 669 (2d Cir. 2005) ("The surveillance video depicts plaintiff performing physical activities she claimed she was incapable of performing. AETNA did not discount plaintiff's subjective complaints of pain, but it was well within its rights as Plan Administrator to view Plaintiff's subjective complaints in the context of these inconsistencies."). In the present case, the surveillance video of Jacoby demonstrates that her physical abilities well exceeded the restrictions and limitations she was claiming. In September and particularly December 2005, Jacoby was observed engaging in numerous activities which, based on her self-reports, she said she could not do. For example: (1) Jacoby said she could only drive for twenty minutes, but she drove non-stop for three hours; (2) Jacoby said she could only walk one block and stand for five minutes, but she was in Macy's shopping for 35 minutes; (3) Jacoby said her gait was slow, but she was seen ambulating normally and even quickly pushing a shopping cart with no sign of distress; (4) Jacoby said she could only bend to 30 degrees, yet she was seen bending over at 90 degrees to

move items in the trunk of her car; and (5) Jacoby said she had balance problems, yet she was seen at various times carrying multiple of cups of coffee in a tray, lifting six grocery bags out of a cart and carrying two large bags (and her purse) out of Macy's.

Moreover, in her March 15, 2006 interview with Investigator Budkus, he observed that Jacoby "walked and moved throughout her home without any noticeable limitations or restrictions" and that her "movements appeared fluid and smooth, which is consistent with what was viewed during the activity check." HAR SIU 114. Budkus also stated that he "did not observe any type of cognitive or concentration type difficulties during the [three hour] interview process" and that Jacoby possessed "the ability to communicate, understand questions and instructions, and articulate her answers." *Id.*

These record facts reasonably cast doubt on Jacoby's subjective claims that she was incapable of performing any physical activity, even, as she claimed, something as simple as holding up a telephone receiver. HAR923. In light of the absence of objective evidence supporting Jacoby's claim of disability, it was neither arbitrary nor capricious, nor an abuse of Hartford's discretion for it to "credit the objective evidence, which failed to establish [Jacoby's] symptoms or their affect on [her] ability to work, over [Jacoby's] subjective complaints of pain." *Parisi,* 2007 U.S. Dist. LEXIS 93472 at **41-42. *See, e.g., Lee v. Aetna Life*, 2007 U.S. Dist. LEXIS 38205, *14 (S.D.N.Y. May 24, 2007) ("In light of the lack of clinical evidence or actual diagnosis, her doctor's statements of her disability were necessarily based only on . . . self-reported symptoms, and amount to no more than their assessment of her credibility. That assessment carries little weight in supporting a disability claim."). For these reasons alone, summary judgment is appropriate for Hartford.

### 2. Hartford reasonably relied on the opinions of the independent doctors who reviewed Jacoby's records and spoke with her treating physician.

In its initial review and appellate review of Jacoby's claim for benefits, Hartford obtained independent medical record reviews from *four* separate, independent healthcare providers (three physicians and one Ph.D. neuropsychologist). In detailed, well reasoned opinions, these doctors unanimously found that Jacoby was not disabled from performing sedentary work. On this basis alone, there was no abuse of discretion.

Hartford did not abuse its discretion in denying Jacoby's claim for continuing benefits because it credited the opinions of four independent doctors over the opinions of Jacoby's treating physicians. The United States Supreme Court has held that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Dis. Plan v. Nord*, 538 U.S. 822, 834, 123 S. Ct. 1965 (2003); *see also Bayonne v. Pitney Bowes, Inc.*, 161 Fed. Appx. 144 (2d Cir 2006) (same); *Waterbury v. Liberty Life Ins. Co.*, 202 Fed. Appx. 477 (2d Cir. 2006) (same); *Butler v. The New York Times Co.*, 2007 U.S. Dist. LEXIS 18400 (S.D.N.Y. March 7, 2007) ("Though Defendant ultimately chose not to adopt the viewpoint of Plaintiff's personal treating physician, Defendant's decision to deny benefits was based upon the accumulation of such evidence that a reasonably mind might accept as adequate to support the conclusion reached"). Indeed, treating physicians' assessments that are based on subjective complaints of pain "carry little weight in supporting disability claims, and the plan administrator is not required to accept them." *Parisi, supra*, at *43. A court may not require the administrator to give special deference to a claimant's treating physicians' opinions, nor may the court "second-guess [the administrator's] reliance on the independent experts who determined

that [the plaintiff] was not disabled." *Waterbury, supra*; *see also Gannon v. Aetna Life Ins. Co.*, 2007 U.S. Dist. LEXIS 72529, *40 (S.D.N.Y. 2007) (finding that an insurer "was not required to defer to the opinion of the plaintiff's psychiatrist").

Hartford's decision to credit the opinions of the independent medical records reviewers over Plaintiff's treating physicians was reasonable as a matter of fact and law. The independent doctors reviewed all of the evidence in the file, consisting of the medical records, the testing, the surveillance evidence, the interviews and telephone discussions with Dr. Levine. Each of the independent doctors found that Jacoby was able to work in a sedentary occupation and in their opinions made clear that they had considered the relevant evidence and arguments offered by Jacoby and her treating physicians.

In essence, the opinions of the independent medical reviewers constitute substantial evidence supporting the decision of Hartford. At worst, these opinions create a conflict in the evidence as to whether Jacoby was disabled. Because the law is well established that a fiduciary under ERISA does *not* abuse its discretion by choosing among conflicting medical opinions, summary judgment should be entered for Hartford. *Lekperic v. Bldg. Serv. 32B-J Health Fund*, 2004 U.S. Dist. LEXIS 14020 (E.D.N.Y. 2004) (finding that although the plaintiff submitted evidence from her treating physicians who found her to be totally disabled, the insurer's decision to deny benefits based on conflicting medical opinions was not arbitrary or capricious) (and numerous cases cited therein); *Rosario v. Local 32B-32J*, 2001 U.S. Dist. LEXIS 11919 (S.D.N.Y. 2001) (finding that the insurer correctly exercised its discretion when it relied on conflicting medical opinions and found that the plaintiff could engage in light work).

## CONCLUSION

The decision of Hartford was supported by substantial evidence and it was not arbitrary and capricious. Accordingly, summary judgment should be entered for Hartford.

Dated:        New York, New York
              March ____, 2008

                         TROUTMAN SANDERS LLP

                         By: _____
                         Christina H. Bost Seaton (CB-7667)
                         TROUTMAN SANDERS LLP
                         The Chrysler Building
                         405 Lexington Avenue
                         New York, New York 10174
                         (212) 704-6000

                         David E. Constine, III (VSB No. 23223)
                         Admitted *pro hac vice*
                         Troutman Sanders LLP
                         P. O. Box 1122
                         Richmond, Virginia 23218-1122
                         (804) 697-1200
                         FAX (804) 697-1339

                         Attorneys for Defendant
                         Hartford Life and Accident Insurance Company

35

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am attorney for Defendant and that on March _____, 2008, I electronically filed a copy of the foregoing with the Clerk of the Court and served a copy of the same by first class mail to the following:

TO:
Scott M. Riemer
60 East 42nd Street
Suite 2430
New York, NY 10165


Dated: New York, New York
     March _____, 2008



                              _____
                              Christina H. Bost Seaton (CB-7667)
                              TROUTMAN SANDERS LLP
                              The Chrysler Building
                              405 Lexington Avenue
                              New York, New York 10174
                              (212) 704-6000