RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
Office and Post Office Address
60 East 42nd Street, Suite 2430
New York, New York  10165
(212) 297-0700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
JULIE JACOBY                                    07 Civ 4627 (LAK)(RLE)

                          Plaintiff,

            -against-

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY

                          Defendant.
----------------------------------------------------------------X

# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Of Counsel
        Scott M. Riemer
        Jonathan Feigenbaum
        Rachel Wilgoren

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES……………………………………………………….     iii

PRELIMINARY STATEMENT…………………………………………………     1

FACTUAL BACKGROUND……………………………………………………     2

ARGUMENT……………………………………………………………….....     3

I.  HARTFORD'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED
BECAUSE THE PROPER STANDARD OF REVIEW IS *DE NOVO*……………………….     4

    A.  Article III of the Constitution Requires a *De Novo* Plenary Proceeding When an
    ERISA Insurance Case is Defended by a Conflicted Insurance Company……………     5

        1.  The Constitution Requires the Adjudication of "Private Rights" By An
        Unfettered Article III Court……………………………………………...     5

            a.  ERISA Insurance Benefits Are "Private Rights" Requiring Article
            III Adjudication……………………………………………………..     5

        2.  Relegation of Judicial Power, In The Form of Deference To A Conflicted
        Insurance Company, Is Constitutionally Impermissible……………………     7

            a.  The Two Limited Exceptions Specified in *Thomas* and *Schor* Do
            Not Authorize The Relegation Of Judicial Power To A Conflicted
            Insurance Company……………………………………………………     7

            b.  The Text and Legislative History Of ERISA Do Not Authorize A
            Relegation Of Judicial Power To A Conflicted Insurance Company…     10

            c.  *Firestone* Does Not Authorize The Relegation Of Judicial Power
            To A Conflicted Insurance Company…………………………………     11

    B.  Hartford Was, In Fact, Influenced By Its Inherent Conflict Of Interest…………...     13

II.  UNDER A *DE NOVO* STANDARD OF REVIEW, SUMMARY JUDGMENT IS
INAPPROPRIATE…………………………………………………………………     15

III.  EVEN IF, *ARGUENDO*, THE APPROPRIATE STANDARD OF REVIEW WERE
ABRITRARY AND CAPRICIOUS, SUMMARY JUDGMENT NONETHELESS
SHOULD BE DENIED………………………………………………………………     15

    A.  Hartford's Determination Was Not Supported By Substantial Evidence…………     16

i

1. Hartford's Consultants Do Not Support Jacoby's Return to Work……….     17

2. The Consultant's Reports Fail To Satisfy Minimum Standards of
Reliability…………………………………………………………………...     18

    a.   The Doctors Were Not Properly Qualified to Evaluate Jacoby…...     18

    b.   Hartford's Consultants Applied an Inherently Unreliable
Methodology for Determining Disability Based on Fatigue, Pain
and Cognitive Deficits……………………………………………….     19

    c.   Hartford's Consultants Failed to Properly Credit the Findings and
Opinions of Jacoby's Treating Physicians………………………...     20

    d.   Hartford's Consultants Failed to Properly Credit Plaintiff's
Credible Complaints of Fatigue and Pain…………………………     22

    e.   Hartford's Doctors' Reports are Conclusory……………………...     24

    f.   Hartford's Consultants Unreasonably Failed to Consider the
Determination of the Social Security Administration…………….     26

    g.   Hartford's Consultants Unreasonably Relied on Unrepresentative
and Unreliable Videotape Surveillance of Jacoby………………...     27

B.  Hartford Failed to Provide Jacoby with a Full and Fair Review…………………     29

CONCLUSION………………………………………………………………………......     31

TABLE OF AUTHORITIES

CASES

*Abrams v. Cargill,* 395 F.3d 882 (8th Cir. 2005)……………………………………….. 24, 30-31

*Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236………………….… 9

*American Tobacco Co. v. Patterson*, 456 U.S. 63, 102 S.Ct. 1534 (1982)…………….….. 11

*Black v. UNUMProvident Corp.,* 245 F.Supp.2d 194 (D.Me. 2003)…………………….… 8

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965(2003)………….. 14, 20

*Caplan v. CNA Financial Corp.,* 2008 U.S. Dist. LEXIS 28290 (N.D.Ca. 2008)………….. 14

*Chan v. Hartford Life Ins. Co.*, 2004 U.S. Dist. LEXIS 17962 (S.D.N.Y. 2004)…………… 22, 27-28

*College Sav. Bank v. Fla. Prepaid Postsecondary Edu. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219 (1999)……………………………………………………………………….… 9

*Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 106 S.Ct. 3245 (1986).… 5, 7-10

*Connell* v. *The Guardian Life Ins. Co. of America Severance Plan,* 2003 U.S. Dist LEXIS 10628 (S.D.N.Y. 2003)……………………………………………………………….. 15-16, 29

*Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127 (2d Cir. 2001)……………... 22

*Cook* v. *The New York Times Co. Group LTD Plan,* 2004 U.S. Dist LEXIS 1259 (S.D.N.Y. 2004)………………………………………………………………………….. 16, 29-31

*Crocco* v. *Xerox Corp.,* 137 F.3d 105 (2d Cir. 1998)………………………………….... 16, 29

*Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285 (1932)………………………………….. 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786 (1993)……... 2, 16-17, 19

*Demirovic v. Building Service 32B-J Pension Fund*, 467 F.3d 208 (2d Cir. 2006)…………. 18

*Downs v. Liberty Life Ass. Co. of Boston*, 2005 U.S. Dist. LEXIS 22531 (N.D. Tex. 2005)... 7-8

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948 (1989)………………    4, 6, 11-12

*Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782 (1989)…. ………………..    5

*Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 122 S.Ct. 708 (2002)………    11

*Hammer* v. *First UNUMLife Ins. Co.,* 2004 U.S. Dist. LEXIS 16893 (S.D.N.Y. 2004)……..    16, 29

*Hanusik v. Hartford Life Ins. Co..* 2008 U.S. Dist. LEXIS 7520 (E.D. Mich. 2008)………..    27

*Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003)…...    22

*Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264 (2d Cir. 1995)…...    15

*Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243 (2d Cir. 1999)………………..    4

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1993)………………………………………………………………………………………………    19, 24

*Lemaire v. Hartford Life and Accident Ins. Co.,* 2003 U.S. App. LEXIS 13421 (3d Cir. 2003)………………………………………………………………………………………………    22

*Met. Life Ins. Co. v. Glenn*, Docket No. 06-923……………………………………………...    1

*Mikrut v. UNUM Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 92265 (D.Conn. 2006)……...    13, 26

*Miller v. United Welfare Fund*, 72 F.3d 1066 (2d Cir. 1995)…………………………………...    15-16

*Moon v. UNUM Provident Corp.,* 2005 U.S. App. LEXIS 4775 *24 (6th Cir. 2005)………...    20

*Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855)……………………………………………………………………………………...    4

*Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indust.*, 2004 U.S. Dist. LEXIS 27777 (E.D.N.Y. 2004)………………………………………...    16

*Pagan v. NYNEX Pension Plan*, 52 F.3d 438 (2d Cir. 1995)………………………………...    16

*Peretz v. United States*, 501 U.S. 923, 111 S.Ct. 2661 (1991)………………………………    5

*Pilot Life v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549 (1987)…………………………………...    6

*Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89 (2d Cir. 2000)…………………………...    13

*Rabuck v. Hartford Life and Acc. Ins. Co.*, 2007 U.S. Dist. LEXIS 80246 (W.D. Mi. 2007)    14

*Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 122 S.Ct. 2151 (2002)………………..    12-13

*Sansevera v. E.I. DuPont de Nemours & Co., Inc.*, 859 F. Supp. 106 (S.D.N.Y. 1994)……..    22

*Sheehan v. Met. Life Ins. Co.,* 2005 U.S. Dist. LEXIS 4087 (S.D.N.Y. 2005)………………    19

*Swaback v. American Information Technologies Corp.*, 103 F.3d 535 (7th Cir. 1996)………...    15

*Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 105 S.Ct. 3325 (1985)    5-10

*Winter v. The Hartford Life and Accident Ins. Co.*, 2004 U.S. Dist. LEXIS 4550 (E.D.N.Y. 2004)…………………………………………………………………………...............    27

*Zurndorfer v. UNUM Life Ins. Co. of Am.*, 2008 U.S. Dist. LEXIS 26278 (S.D.N.Y. 2008)    27

<u>CONSTITUTIONAL MATERIALS</u>

Article I………………………………………………………………………………..    4, 7-8, 11

Article II………………………………………………………………………………….    1, 4-11

<u>STATUTES AND REGULATIONS</u>

29 C.F.R. §2560.503-1(g)(1)(iii)…………………………………………………………    29
29 C.F.R. 2560.503-1(h)(3)(iii)…………………………………………………………    19
ERISA §2(b), 29 U.S.C. §1001(b)………………………………………………………    9-10
ERISA §502(a)(1)(B), 29 U.S.C. §1132(a)(1)(b)………………………………………….    6, 10-11
ERISA §502(e)(1), 29 U.S.C. §1132(e)(2)………………………………………………...    10
ERISA §502(f), 29 U.S.C. §1132(f)………………………………………………………    10
ERISA §514(b)(1), 29 U.S.C. §1144(b)(1)………………………………………………...    6

## FEDERAL RULES OF CIVIL PROCEDURE

Rule 702 ………………………………………………………………………………...  1,
16-
17,
19

## LEGISLATIVE MATERIALS

S. Report 93-383, reprinted in 1974 U.S. Code Cong. & Admin. News 5000………………..  10

## SECONDARY MATERIALS

Richard H. Fallon, *Of Legislative Courts, Administrative Agencies, and Article III*, 101
Harv. L. Rev. 916 (1988)……………………………………………………………………...  4

<u>PRELIMINARY STATEMENT</u>

In deciding this motion, this Court should reserve decision until the Supreme Court issues its decision in *Metropolitan Life Ins. Co. v. Glenn*, Docket No. 06-923. *Glenn* is set for oral argument on April 23, 2008 and will consider how a Court should take into account the inherent conflict of interest of a dual-role insurer (like Hartford in this case). Because the outcome of *Glenn* could affect the legal standard to be applied in this case, plaintiff urges the Court to defer decision and permit additional briefing if it will be helpful to the Court.

Summary judgment is inappropriate because the appropriate standard of review in this case is *de novo*. Hartford cannot satisfy its burden of establishing the arbitrary and capricious standard of review. First, plaintiff has a constitutional right to have her "private right" to long term disability benefits adjudicated under the "judicial power" of an Article III Court. Granting any level of deference to Hartford under the arbitrary and capricious standard of review would be a constitutionally impermissible relegation of judicial power and is, therefore, impermissible. Second, Hartford was, in fact, influenced by its inherent conflict of interest as evidenced by its disregard of the opinions of Jacoby's treating physicians, disregard of Jacoby's complaints of pain and fatigue, disregard of the determination of the Social Security Administration, its hiring of a beholden consulting firm to conduct "independent" medical reviews, and its reliance on a reviewing doctor who (contrary to the consensus in the medical community) denies the validity of chronic fatigue syndrome and fibromyalgia.

Even if, *arguendo*, the appropriate standard were the arbitrary and capricious standard, summary judgment should be denied because there is at least an issue of material fact that Hartford's termination of Jacoby's benefits was arbitrary and capricious. First, Hartford's termination was not supported by substantial evidence. None of the consultant reports relied on

1

by Hartford would even satisfy the minimum requirements of reliability established by *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 702. Second, Hartford denied Jacoby a full and fair review. Hartford's initial denial letter did not adequately inform Jacoby of the information needed to perfect her appeal. Then, once Jacoby submitted her appeal, Hartford sandbagged her by relying on the reports of two consulting doctors, without giving her the opportunity to respond.

<u>FACTUAL BACKGROUND</u>

For three years, Hartford found Jacoby "totally disabled" under the terms of Group Policy No. GLT-707637 (the "Policy"). It concluded that Jacoby's symptoms resulting from chronic fatigue syndrome caused her to be occupationally impaired under the Policy. Then, without a change in her condition, Hartford contended that Jacoby was no longer impaired and unlawfully terminated her benefits, prompting this litigation.

The Hartford claim file contains objective clinical evidence backed by expert opinions establishing that Jacoby is totally disabled under the Policy as a result of chronic fatigue syndrome and cognitive deficits. Five medical doctors and two neuropsychologists opine that Jacoby is totally disabled from her occupation. They are: (i) Dr. Anna Rosen Noran, Ph.D., Director of Winthrop Psychological Services (HAR 00006); (ii) Leo J. Shea III, Ph.D., Clinical Psychologist/Neuropsychologist, Clinical Assistant Professor of Rehabilitation Medicine, New York University School of Medicine (HAR 00008, HAR 00222-HAR00237); (iii) Susan Levine, M.D., Board Certified in Internal Medicine and Infectious Diseases (HAR 00007-00008, 00679-00682); (iv) Ritchie C. Shoemaker, M.D., P.A. of Maryland's Chronic Fatigue Center (HAR 00008, 00274-00282); (v) Benjamin H. Natelson, M.D., Director of the NJ CFS/FM Center and Principal Investigator for the national CFS/FM Center grant from the National Institute of

2

Immunology and Infectious Diseases (NIAID) that funds the Center's research branch (HAR 00008, 00383-00384); (vi) Richard N. Podell, M.D. (HAR 00008, 00387-00425) ; and (vii) Derek Enlander, M.D. (HAR 00008, 00426-00431).

Their opinions are congruent with the independent evaluation of the Social Security Administration, which found Jacoby to be totally disabled from "any gainful occupation" as of December 20, 2002.  (HAR 1047-1050).

The following objective evidence supports both the diagnosis of Jacoby's condition and her disability.

1.    <u>Abnormal SPECT scans of the brain</u>.  Two SPECT scans of the brain, performed in 2002 and 2004, respectively, document abnormalities.  (HAR 00368-00371).  These abnormal brain scans corroborate the diagnosis of chronic fatigue syndrome.

2.    <u>Abnormal MRI's</u>.  Four MRI's of the brain, two performed in 2002, and one performed in each of 2003 and 2004, all document abnormalities.  (HAR 00005, 00008-00009, 00345, 00347-00348, 00354-00355, 00360-00362, 00367, 00907, 00917).  These abnormal MRI's corroborate the diagnosis of chronic fatigue syndrome.

3.    <u>Abnormal neuropsychological testing</u>.  The testing documents a significant decline in cognitive functioning consistent with a diagnosis of chronic fatigue syndrome and the results of the brain SPECT scans and MRI's.  (HAR 00008, 00222-00237).  The testing objectively establishes that, for cognitive reasons alone, Jacoby is unable to perform the duties of any occupation for which she is qualified by education, training or experience.

4.    <u>Mental Impairment Questionnaire</u>.  The questionnaire, completed by Dr. Anna Rosen Noran on September 23, 2003, documents cognitive impairments consistent with a diagnosis of chronic fatigue syndrome.  (HAR 00006, 00086, 01030).  In approving Jacoby's application for long term disability benefits in September 2003, Hartford's Claim Examiner, William Conklin, relied in large part on Dr. Rosen Noran's report.  (HAR 00124)

5.    <u>Abnormal Tilt Table Study</u>.  The abnormal results of the Tilt Table Study (HAR 00004, 00008, 00372-00373) corroborate the diagnosis of chronic fatigue syndrome.

6.    <u>Abnormal blood/lab work</u>.  Abnormal results on blood work and other laboratory tests corroborate the diagnosis of chronic fatigue syndrome.  (HAR 00274-00275, 00277, 00288-00311, 00362, 00383).

7.    <u>Cardiopulmonary exercise test</u>.  (HAR 00374-00377). The test shows significant reduction in anaerobic threshold which is typical of patients who are disabled from chronic fatigue syndrome.  (HAR 00333).

8.    <u>Abnormal MRI of spine</u>.  The abnormal results of the MRI corroborate plaintiff's reports of pain.  (HAR 00778-00779).

<u>ARGUMENT</u>

I.    <u>Hartford's Motion For Summary Judgment Should Be Denied Because The Proper Standard Of Review Is *De Novo*</u>

*De novo* review is the default standard.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The fiduciary bears the burden of proving the predicates that justify application of the arbitrary and capricious standard.  *Kinstler v. First Reliance Standard Life Ins. Co.,* 181 F.3d 243, 249 (2d Cir. 1999).  Hartford cannot satisfy its burden for two reasons.  First, plaintiff has a constitutional right to have her "private right"[1] to long term disability benefits adjudicated under the "judicial power" of an Article III Court.  Granting any level of deference to Hartford under the arbitrary and capricious standard of review would be a constitutionally impermissible relegation of judicial power and is, therefore, impermissible.  Second, Hartford was, in fact, influenced by its inherent conflict of interest as evidenced by its disregard of the opinions of Jacoby's treating physicians, disregard of Jacoby's complaints of pain and fatigue, disregard of the determination of the Social Security Administration, its hiring of a beholden consulting firm to conduct "independent" medical reviews, and its reliance on a reviewing doctor who (contrary to the consensus in the medical community) denies the validity of chronic fatigue syndrome and fibromyalgia.

---

[1]  *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284, 15 L.Ed. 372, 377-378 (1855) (Distinguishing between "private right" requiring Article III adjudication and the exception for "public rights" which may be resolved by administrative agencies or Article I Courts); Richard H. Fallon, *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L. Rev. 916 (1988) (concluding that meaningful judicial review in an Article III court is a necessary and sufficient requirement under the Constitution).

A.   Article III Of The Constitution Requires A *De Novo* Plenary Proceeding When An ERISA Insurance Case Is Defended By A Conflicted Insurance Company

    1.   The Constitution Requires the Adjudication of "Private Rights" By An Unfettered Article III Court

        Article III of the Constitution not only serves as an inseparable element of the constitutional system of checks and balances, but it also confers a personal right on litigants to have an Article III judge preside over a civil trial. *Peretz v. United States*, 501 U.S. 923, 936, 111 S.Ct. 2661 (1991). Article III "preserves to litigants their interest in an impartial and independent federal adjudication of claims within the judicial power of the United States." *See Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 850, 106 S.Ct. 3245 (1986).

        The Supreme Court has held that Article III restricts Congress from relegating adjudicative functions to non-Article III courts and tribunals when the dispute is over "private" rather than "public" rights. *See, Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52, 109 S.Ct. 2782 (1989):

> Our prior cases support administrative factfinding in only those situations involving "public rights," e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated. [2]
> . . .
> . . . if a statutory cause of action, . . . is not a "public right" for Article III purposes, then Congress may not assign its adjudication to a specialized non-Article III court lacking the essential attributes of the judicial power.

---

[2] In his concurring opinion, Justice Scalia indicated that he would hold that public rights are only those affecting the government. All other rights are private rights. Justice Scalia indicated that he departed from the exceptions described in *Thomas* and *Schor*:

> The notion that the power to adjudicate a legal controversy between two private parties may be assigned to a non-Article III, yet federal, tribunal is entirely inconsistent with the origins of the public rights doctrine. The language of Article III itself, of course, admits of no exceptions. . .

492 U.S. 33 at 66.

Thus, "private rights" must be decided by an impartial and independent Article III court. This means an independent adjudication without deference to one of the parties to that very litigation.

a.  ERISA Insurance Benefits Are "Private Rights" Requiring Article III Adjudication

A claim for long term disability benefits from a private insurance company is a quintessential "private right." Prior to the enactment of ERISA, employer-provided long term disability insurance claims were adjudicated under state insurance law. When Congress passed ERISA, however, it effectively "federalized" all private sector employee benefits, including long term disability benefits. In so doing, 29 U.S.C. §1132(a)(1)(B) displaced traditional State causes of action under State insurance laws.[3] *See Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549 (1987) (holding state common law causes of action arising from the improper processing of a claim are preempted under ERISA).

Because Jacoby's litigation against Hartford arises from a private property dispute that, prior to the passage of ERISA, was historically resolved under State laws, her claim is one that requires Article III resolution. *See Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 587, 105 S.Ct. 3325 (1985) ("Most importantly, the statute in *Crowell* displaced a traditional cause of action and affected a pre-existing relationship based on a common-law contract for hire. Thus it clearly fell within the range of matters reserved to Article III courts . . . ").

---

[3]  State insurance law is not entirely pre-empted. 29 U.S.C. §1144(b)(1) saves certain insurance law from federal preemption in connection with fully-insured ERISA plans.

2.  Relegation Of Judicial Power, In The Form Of Deference To A Conflicted
    Insurance Company, Is Constitutionally Impermissible

There is no authority in the Supreme Court's constitutional precedents, ERISA or

*Firestone* for denying Mrs. Jacoby her constitutional right to an impartial and independent

federal adjudication under Article III.

a.  The Two Limited Exceptions Specified In *Thomas* And *Schor* Do Not
    Authorize The Relegation Of Judicial Power To A Conflicted Insurance
    Company

There are only two limited instances in which Congress is authorized to relegate

adjudicative authority of "private rights" for resolution by a non-Article III court or tribunal.  *See*

*Thomas*, 478 U.S. 568 (1985); *Schor*, 478 U.S. 833 (1986).  In enacting ERISA, Congress

invoked neither.

In *Thomas*, the Supreme Court permitted an Article I arbitration adjudication,

subject to judicial review only for fraud, misrepresentation, or other misconduct, because:  (1)

the right created by the Federal Insecticide, Fungicide, and Rodenticide Act as to the use of a

registrant's data was not a purely "private" right, but bore many of the characteristics of a

"public" right; (2) the arbitration scheme was necessary as a pragmatic solution to the difficult

problem of spreading the costs of generating adequate information regarding the safety, health

and environmental impact of a potentially dangerous product; and (3) the scheme contained its

own sanctions and subjected no unwilling defendant to judicial enforcement power.  Given the

nature of the right at issue and the concerns motivating Congress, the Supreme Court held that

the Article I adjudication did not violate Article III.  473 U.S. 568 at 590.

On its face, the *Thomas* exception is inapplicable to ERISA insurance cases

because Congress did not even create an Article I Court or tribunal (including a private insurance

company) to decide employee benefit disputes arising under ERISA.  *See, e.g.*, *Downs v. Liberty*

*Life Ass. Co. of Boston*, 2005 U.S. Dist. LEXIS 22531, *19 (N.D. Tex. 2005) (". . . Congress did not delegate any adjudicative authority to employers or plan administrators when enacting ERISA . . ."); *Black v. UNUMProvident Corp.*, 245 F.Supp.2d 194, 199 (D.Me. 2003)("ERISA does not delegate any adjudicative functions to an otherwise private party."). Thus, there is <u>no</u> *Thomas*-like relegation to an administrative agency or legislative Article I tribunal.

In *Schor*, the Supreme Court held that "Article III's guarantee of an impartial and independent federal adjudication is subject to waiver, just as are other personal constitutional rights that dictate the procedures by which civil and criminal matters must be tried." *Schor*, 478 U.S. 833 at 848-849. The *Schor* waiver exception, however, cannot justify deference to a conflicted insurance company because: (1) Congress did not establish a method under which a claimant could waive her Article III rights; and (2) there has been no voluntary, knowing and intelligent waiver by plaintiff.

First, in *Schor*, Congress specifically established an Article I tribunal under which a claimant could voluntarily assert a claim. 478 U.S. 833 at 855 ("Congress gave the CFTC the authority to adjudicate such matters, but the decision to invoke this forum is left entirely to the parties . . ."). ERISA is different. As argued, *supra*, neither the ERISA statute, nor its legislative history, contains any language establishing an Article I tribunal at the Department of Labor or otherwise. Moreover, the ERISA statute does not contain any language establishing a waiver scheme under which a claimant may voluntarily waive her right to an Article III proceeding in favor of a deferential review.

Second, in *Schor*, there was no dispute that the plaintiff voluntarily waived her right to Article III adjudication by voluntarily filing a counterclaim before the CFTC. Here, no argument can be made that plaintiff meaningfully waived her Article III rights. Constitutional

rights cannot be waived haphazardly, but, rather, only in a voluntarily, knowing and intelligent manner.  *See, e.g., Adams v. United States ex rel. McCann,* 317 U.S. 269, 63 S.Ct. 236 (1942) (waiver of right to jury trial).  "Courts indulge every reasonable presumption against waiver of fundamental constitutional rights."  *See also College Sav. Bank v. Florida Prepaid Postsecondary Education Expense Board*, 527 U.S. 666, 682, 119 S.Ct. 2219 (1999).

A waiver cannot be inferred by the mere fact that Jacoby voluntarily enrolled as a plan participant under the Hartford insurance policy or commenced a lawsuit in federal court. There is no evidence that Jacoby was provided an opportunity to elect coverage subject to a *de novo* proceeding versus coverage where Hartford's determination would be granted deference. Nor was she provided with a document explaining her constitutional rights afforded under Article III and what the consequence of waiving those rights might be.

Moreover, the fact that Jacoby's employer might have voluntarily agreed to the inclusion of discretionary language in the plan document of the long term disability plan is insufficient to constitute a meaningful constitutional waiver on her part.  A third-party "constructive waiver" by Jacoby's employer is far afield from the undisputed waiver in *Schor* and the meaningful waiver required of *Adams,* 317 U.S. 269 at 272-273.  As the Supreme Court stated in *College Sav. Bank*, 527 U.S. 666, 682 (1999):

> We think that the constructive-waiver experiment of *Parden* was ill conceived . . .
> . . .
> Indeed, *Parden*-style waivers are simply unheard of in the context of *other* consti-
> tutionally protected privileges.  As we said in *Edelman*, "constructive consent is
> not a doctrine commonly associated with the surrender of constitutional rights."

Thus, the Supreme Court has clearly enunciated that waiver of a constitutional right, such as to Article III adjudication, must be made affirmatively and in conformity with

waivers of other personal constitutional rights.  Such a waiver cannot be made by implication or construction.  *Id*.

      b.   <u>The Text And Legislative History Of ERISA Do Not Authorize A Relegation Of Judicial Power To A Conflicted Insurance Company</u>

Not only did Congress decide not to create a *Thomas*-like regulatory scheme or a *Schor*-like waiver scheme, Congress explicitly created a regulatory scheme that grants ERISA participants and beneficiaries full and unimpeded access to the federal courts.  29 U.S.C. §1001(b) declares that it is the policy of the statute to protect the interests of participants and their beneficiaries "by providing for appropriate remedies, sanctions, and ready access to the Federal courts."  29 U.S.C. §1132(a)(1)(B) grants participants and beneficiaries the right to commence a "civil action" and provides no limitation on the procedural protections conferred by the Federal Rules of Civil Procedure.  29 U.S.C §1132(f) provides that "the district courts shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties."  29 U.S.C §1132(e)(2) then makes it easy for participants and beneficiaries to file a civil action by creating one of the most liberal venue provisions in federal law.  An action may be brought "in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found."

Indeed, in early drafts of ERISA, Congress considered creating an Article I tribunal, *i.e.*, a grievance or arbitration proceeding before the Secretary of Labor,[4] to resolve disputes.  The final bill, however, did not contain either of these proposals.  Rather, it unambiguously provides for a private right of action in the District Courts.  (29 U.S.C. §1132(f)).

---

[4]  *See* S. Report 93-383, *reprinted in*, 1974 U.S.C.C.A.N. 4890, 4999-5000 ("the opportunity to resolve any controversy over [ ] retirement benefits under qualified plans in an inexpensive and expeditious manner . . . Accordingly, the committee has decided to provide that controversies as to retirement benefits are to be heard by the Department of Labor.").

The fact that Congress considered and then purposefully rejected an Article I tribunal is conclusive proof that Congress did not intend to limit the Article III rights of claimants.

Because the text of ERISA is clear, the courts are not free to create a different regime when Congress chose not to. *See American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534 (1982) ("'[O]ur starting point must be the language employed by Congress,' and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used'") (internal citations omitted). The Supreme Court has repeatedly described ERISA as a "comprehensive and reticulated statute," "the product of a decade of congressional study of the Nation's private employee benefit system." *See, e.g., Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209, 122 S.Ct. 708 (2002). Courts, therefore, should be very reluctant to create a non-Article III Court or tribunal that Congress did not expressly authorize. Plainly, if Congress wanted the Courts to relegate judicial power to a conflicted insurance company, it would have said so.

c.  *Firestone* Does Not Authorize The Relegation Of Judicial Power To A Conflicted Insurance Company

The relegation of judicial power to Hartford is not authorized by *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948 (1989).[5] *Firestone* never considered the applicability of Article III. Moreover, *Firestone* did not evaluate or consider the significant differences between a fully-insured welfare benefit plan and a fully- funded or unfunded trust.

---

[5]  This Court held the appropriate standard of review was *de novo,* but then, in *dicta,* stated:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard *unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.*

489 U.S. 101 at 109 (emphasis added). The quoted language is *dicta* because none of the plans at issue in the *Firestone* case had language granting the plan administrator or fiduciary discretionary authority. The language is, therefore, not necessary to the holding. Seizing on this *dicta,* insurance companies have readily amended their policies to include grants of discretionary authority, making the vast majority of welfare benefit claims subject to the arbitrary and capricious standard of review.

Rather, the three plans litigated before the Court were:  (1) an unfunded termination pay plan; (2) an unfunded stock purchase plan; and (3) an unfunded pension plan.  *Firestone* specified that its holding applied regardless of whether a plan was "funded or unfunded," *Id*. at 109, but did not specify that it applied to insured plans.

There are good reasons for treating insured plans differently from funded or unfunded plans.  *Firestone* recognized the imperative of not applying a standard of review that "would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted."  489 U.S. 101 at 114.  Granting deference to a conflicted insurance company, however, undermines the protection of employees for the benefit of an insurance company.  Historically, insurance claims have always been treated as *de novo* plenary proceedings in Court.  Certainly, Congress did not intend for ERISA to make it easier for insurance companies to deny benefits to private sector employees.

Moreover, insurance cases have always been treated as breach of contract cases and have not been subject to concepts of trust law.  Granting deference to a conflicted insurance company creates a total reversal of the traditional presumptions in insurance cases.  Under traditional insurance law, ambiguities in insurance policies are interpreted <u>against</u> the insurance company under the doctrine of *contra proferentem*, not in their favor, as happens under a deferential standard of review.

Since *Firestone*, the case for granting deference to a conflicted insurance company has become even more attenuated.  The Supreme Court has questioned the efficacy of a deferential standard when there is a conflict of interest (as in the case of an insurance company, like Hartford, that serves as both decider and payor of benefits).  *See*, *Rush Prudential HMO,*

*Inc. v. Moran*, 536 U.S. 355, 384 n.15, 122 S.Ct. 2151 (2002) ("It is a fair question just how deferential the review can be when the judicial eye is peeled for conflict of interest.").

    B.   Hartford Was, In Fact, Influenced By Its Inherent Conflict Of Interest

A *de novo* review should also be applied because plaintiff has demonstrated that Hartford was, in fact, influenced by its inherent conflict of interest. *See, e.g., Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000).

The facts in the instant case are even stronger than the facts that were sufficient to establish a *de novo* review in *Mikrut v. UNUM Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 92265 (D.Conn. 2006). Judge Underhill held:

> Mikrut has shown that Unum's decision was, in fact, influenced by the inherent conflict of an entity that both administers and insures a plan. Unum adopted the reports of internal consultants, who never personally [*28] examined her, over the conclusions of Mikrut's treating physicians, placing disproportionate reliance on two check-off Unum forms that were completed by one attending physician, who, when asked about Mikrut's condition, did not recall who she was. It refused to address Mikrut's subjective complaints of pain in its analyses. Most significantly, Unum failed to address the SSA's findings, while at the same time relying on her SSA benefits to demand a refund of over
> $ 8000.

In the current case, like *Mikrut*, Hartford placed disproportionate reliance on hired consultants over plaintiff's five treating physicians, refused to address plaintiff's subjective complaints of fatigue and pain, and failed to address the SSA's findings[6] (while at the same time relying on the SSA benefits to reduce plaintiff's benefit). However, beyond the evidence that was sufficient to establish a *de novo* review in *Mikrut*, in this case, Hartford also relied on its

---

[6] Hartford's final denial letter contains boilerplate language that indicates a general Hartford policy of treating Social Security determinations as irrelevant to Hartford's determinations. The April 23, 2007 letter provides, "You may feel that receipt of benefits from the Social Security Administration provides additional corroboration of Ms. Jacoby's claim for total disability. It is our position, that the LTD provider retains the right to investigate and administer benefits in accordance with the terms of the applicable policy and to render decisions independent of the decisions of government agencies, employers and other providers of insurance." (HAR 00014).

chummy relationship with University Disability Consortium ("UDC")[7] to obtain reviewing

physicians and utilized a physician (Dr. Levy) who does not believe that chronic fatigue

syndrome and fibromyalgia are legitimate illnesses.

   The relationship between Hartford and UDC has been exposed in several recent

decisions around the country.  Seventy-five percent of UDC's revenue comes from Hartford and,

since 2002, Hartford has paid UDC more than thirteen million dollars for review services.  *See*

*Caplan v. CNA Financial Corp.*, 2008 U.S. Dist. LEXIS 28290, *12-13 (N.D.Ca. 2008).  As the

Court stated in *Caplan*:

> Hartford's structural conflict of interest is accompanied by its reliance on UDC, a
> company which Hartford knows benefits financially from doing repeat business
> with it, collecting more than thirteen million dollars from Hartford since 2002.  It
> follows that Hartford knows that UDC has an incentive to provide it with reports
> that will increase the chances that Hartford will return to UDC in the future – in
> other words, reports upon which Harford may rely in justifying its decision to
> deny benefits to a Plan participant.  UDC's marketing materials also suggests that
> it offers insurers and plan administrators services that will support a parsimonious
> approach to administering claims.

2008 U.S. Dist. LEXIS 28290 at *18-19.  *See also Rabuck v. Hartford Life and Acc. Ins. Co.*,

2007 U.S. Dist. LEXIS 80246, *74-75 (W.D. Mi. 2007) ("Defendant's brief repeatedly labels the

file review conducted by Dr. Vita (and later Dr. Podrid) of University Disability Consortium

(UDC) as being 'independent.'  Nothing in the administrative record supports this assertion.").[8]

   Moreover, Hartford utilized the review services of Dr. Levy, who is a denier of

both chronic fatigue syndrome and fibromyalgia despite their recognition and classification by

the Centers for Disease Control and the Social Security Administration.  Dr. Levy tellingly

admits in his report, "With respect to the diagnosis of chronic fatigue syndrome, I know that

---

[7]  UDC's name is a misrepresentation in itself.  UDC is a privately-owned, for-profit company with no affiliation
with any university or university organization.  See www.universitydisabilityconsortium.com.
[8]  *See also Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003) ("Physicians repeatedly retained by
benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers['] money
and preserve their own consulting arrangements.")

attempts have been made to codify that disorder.  I always find it interesting to note that the

'diagnostic criteria' also fit the criteria in the DSM IV which is defined as an undifferentiated

somatoform disorder.  I also think that it is very interesting that no definitive pathoanatomical

correlate exists with chronic fatigue.  The cause of the disorder has never been identified.  There

is no infectious agent that consistently has been found."  (HAR 00674)  While admitting that

plaintiff had "tender points" upon physical examination by her treating physicians, Dr. Levy

stated that "those are subjective and have no validity as it pertains to the diagnosis of

fibromyalgia, which is just a name given to patients who have widespread aches and pains."

(HAR 00674)  Hiring a doctor who did not even recognize plaintiff's illnesses as legitimate

guaranteed that Hartford would obtain a physician's report that supported a denial of benefits.

> Thus, there is ample evidence that Hartford was, in fact, influenced by its inherent

conflict of interest.  Accordingly, the appropriate standard of review is *de novo*.

II.    Under A *De Novo* Standard Of Review, Summary Judgment Is Inappropriate

> Summary judgment is inappropriate under a *de novo* standard of review because

there is an issue of fact as to whether plaintiff is totally disabled under the terms of the Plan.

III.    Even If, *Arguendo,* The Appropriate Standard Of Review Were Arbitrary And
        Capricious, Summary Judgment, Nonetheless, Should Be Denied

> Summary judgment in favor of Hartford should be denied because there is at least an

issue of material fact regarding whether Hartford's determination was arbitrary and capricious and

whether Hartford deprived plaintiff a full and fair review as required under 29 U.S.C. 1133.

> While the arbitrary and capricious review is deferential, it is not a rubber stamp.  *See*

*Swaback v. American Information Technologies Corp.*, 103 F.3d 535, 540 (7th Cir. 1996).  The

court must consider whether the decision was based on a consideration of the "relevant factors"

(*Jordan v. Retirement Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995),

and the denial of benefits will be overturned if the fiduciary's decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller*, 72 F.2d 1066 at 1070; *Pagan*, 52 F.3d 438 at 442.  As explained in *Neely v. Pension Trust Fund of the Pension, Hospitalization & Benefit Plan of the Elec. Indust.*:

> Although limited, review of a determination under the arbitrary and capricious standard is more than a perfunctory review of the factual record in order to determine whether that record could conceivably support the decision to terminate benefits.  Rather, such a review must include a 'searching and careful' determination as to whether the conclusion reached by the administrator in view of the facts before it was indeed rational and not arbitrary.

2004 U.S. Dist. LEXIS 27777, *25 (E.D.N.Y. 2004).

Moreover, failure to provide a full and fair review renders a decision arbitrary and capricious.  *Crocco* v. *Xerox Corp.,* 137 F.3d 105,108 (2d Cir. 1998); *Hammer* v. *First UNUMLife Ins. Co.,* 2004 U.S. Dist. LEXIS 16893, *12 (S.D.N.Y. 2004); *Cook* v. *The New York Times Co. Group LTD Plan,* 2004 U.S. Dist LEXIS 1259 (S.D.N.Y. 2004); *Connell* v. *The Guardian Life Ins. Co. ofAmerica Severance Plan,* 2003 U.S. Dist LEXIS 10628, *6 (S.D.N.Y. 2003).*

A.  Hartford's Determination Was Not Supported By Substantial Evidence

A determination that is not supported by "substantial" evidence is arbitrary and capricious.  *See, e.g. Miller*, 72 F.2d at 1070; *Pagan,* 52 F.3d 438 at 442.  The Courts have not been expansive in describing what is meant by "substantial evidence," other than to state that "[s]ubstantial evidence is such that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker and] . . . requires more than a scintilla but less than a preponderance."  *Miller*, 72 F.3d at 1072.

Despite the lack of specific guidance, however, the minimum requirements of reliability enunciated by the Supreme Court in *Daubert* and Fed. R. Evid. Rule 702 provide a

logical construct for delineating at least a portion of the expert evidence that does <u>not</u> constitute "substantial evidence." If a report would not satisfy the reliability requirements of *Daubert, a fortiori*, it is not a "scintilla" let alone "less than a preponderance."

Hartford's determination was not supported by substantial evidence because it was supported only by the reports of Drs. Levy (HAR 00673-00675), Sniger (HAR 00785-00792), Siegel (HAR 00534-00550) and Garrido-Castillo (HAR 00551-00563). As explained in more detail below, these reports: (1) do not support a return to work; and (2) fail to satisfy even the minimum standards of reliability under *Daubert* and Rule 702.

      1.   <u>Hartford's Consultants Do Not Support Plaintiff's Return to Work</u>

Hartford hired Drs. Siegel and Garrido-Castillo to assess plaintiff's appeal. However, far from opining that plaintiff could return to a sedentary job in a competitive working environment, both doctors opined only that it was possible for plaintiff to undergo a trial return to work under a highly structured and supervised work environment. (HAR 00549, HAR 00562). Hartford glossed over this in its April 23, 2007 appeal denial, stating, without any support, "this scenario would be expected by any individual entering a new position or even the same type of occupation with a new employer." (HAR 00014).

Hartford's *ipse dixit* equation of a return to work in a structured and supervised work environment to the standard of disability[9] under the policy is arbitrary and capricious. A highly structured and supervised work environment does not exist in the economy short of

---

[9] Under the Policy, Jacoby would be totally disabled if she were unable to perform the essential duties of "Any Occupation." Any Occupation is defined as "an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-disability Earnings and the Benefit Percentage and the Maximum Monthly shown in the Schedule of Insurance." (HAR POLICY 025). In Jacoby's case, she must have an earnings potential greater than $31,500 ($4,375 x 60% = $2,625 x 12 = $31,500) (HAR 00066). Thus, to find Jacoby no longer disabled, Hartford must find that Jacoby was capable of working full-time in an occupation for which she was qualified and for which she would earn at least $31,000. Finding that she could work in a structured and supervised environment, without more, is insufficient to establish that she is no longer disabled.

special governmental programs.  Hartford's determination improperly gives no consideration to plaintiff's ability to find such fictional work.  *See Demirovic v. Building Service 32B-J Pension Fund*, 467 F.3d 208, 215 (2006) ("In this case, a proper inquiry would require not only a medical assessment of Demirovic's physical capacity to perform both physical and sedentary work, but also a non-medical assessment as to whether she has the vocational capacity to perform any type of work -- of a type that actually exists in the national economy -- that permits her to earn a reasonably substantial income from her employment, rising to the dignity of an income or livelihood.").

       2.   The Consultants' Reports Fail to Satisfy Minimum Standards of Reliability

       a.   The Doctors Were Not Properly Qualified to Evaluate Plaintiff

Hartford failed to include any evidence in the claim file establishing that any of its consultants were qualified to render opinions as to plaintiff's illnesses and disability.  Indeed, although Hartford describes its consultants as "well-credentialed" (Hartford Br., p. 2), during the claims process and discovery, Hartford repeatedly refused to produce their curriculum vitae to plaintiff.  For example, plaintiff asked for the CV's of Drs. Levy and Sniger on January 22, 2007.  Defendant specifically refused to produce same.  (HAR 00457-HAR 00458).  Similarly, plaintiff requested the CV's of defendant's experts in interrogatories exchanged during discovery.  It is only in support of its motion that Hartford submits the CV's of its consultants.  These CV's are not part of the record, were not provided during discovery, and should be excluded by the Court. There is, therefore, no admissible evidence to substantiate that any of Hartford's consultants are qualified to offer expert opinion.

Moreover, Hartford's reliance on Drs. Levy and Sniger to review Jacoby's claim violates ERISA's mandate to "consult with a health care professional who has appropriate

training and experience in the field of medicine involved in the medical judgment." 29 C.F.R.

2560.503-1(h)(3)(iii). Dr. Levy is a neurologist. (HAR 00018). Dr. Sniger is Board-certified in

Physical Medicine and Rehabilitation and Spinal Cord Injury Medicine. (HAR 00018). Thus,

neither doctor is an expert in chronic fatigue syndrome or fibromyalgia.

>    b.    Hartford's Consultants Applied an Inherently Unreliable Methodology for
>           Determining Disability Based on Fatigue, Pain and Cognitive Deficits

*Daubert* requires that an expert's methodology be reliable. Rule 702 of the

Federal Rules of Evidence was amended in 2000 to adopt the holding of *Daubert*, and imposes

the following prerequisites to establish the admissibility of expert testimony: "(1) the testimony

is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the

case."

None of Hartford's purported "experts" examined plaintiff. There is nothing

reliable about a methodology that consists of a review of a claimant's medical records as the

exclusive method for assessing disability from subjective symptoms such as fatigue, pain and

cognitive deficits. *See, e.g., Sheehan v. Met. Life Ins. Co.,* 2005 U.S. Dist. LEXIS 4087, *72

(S.D.N.Y. 2005) (When a patient's medical condition requires evaluation of subjective

symptoms, courts routinely reject medical reports from physicians who did not examine that

patient).

No reputable doctor would diagnose and treat a patient's fatigue and pain without

first conducting a physical examination. It is truly Medical School 101. *See Kumho Tire Co.,*

*Ltd. v. Carmichael*, 526 U.S. 137, 157,119 S. Ct. 1167, 143 L. Ed. 2d 238 (1993) (the expert

must "employ[] in the courtroom the same level of intellectual rigor that characterizes the

practice of an expert in the relevant field."). However, that is precisely what Hartford's experts

did to assess plaintiff.  Assessing a patient exclusively by reference to medical records is

inherently indirect and unreliable, particularly when the doctor is essentially making a credibility

determination as to complaints of fatigue and pain.  A document review assesses only the

sufficiency of the medical records themselves, rather than assessing whether a claimant is

disabled.  More specifically, it assesses individual doctors' note-taking habits rather than the

claimant's disability.  Admittedly, some of Hartford's consultant's did not even review the full

cadre of plaintiff's medical records.  For example, Dr. Levy's review was limited to Dr. Levine's

records.  (HAR 00673)

        In his report, Dr. Garrido-Castillo even conceded that his findings were limited by

the nature of the record review he performed.  With respect to the neuropsychological testing

Jacoby underwent, he stated, "There are reports of her needing frequent breaks as she tested.

There are also reports of her being exhausted and needing time to recuperate after effortful

activity.  Both considerations are difficult to ascertain on the basis of this paper review."  (HAR

00563).

    c.  <u>Hartford's Consultants Failed to Properly Credit the Findings and Opinions of
        Plaintiff's Treating Physicians</u>

        A Plan <u>must</u> credit the opinions of treating physicians.  *See Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 1972 (2003) ("[P]lan administrators …

may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a

treating physician." ); *Moon v. UNUM Provident Corp.,* 2005 U.S. App. LEXIS 4775 *24 (6th

Cir. 2005).

        Hartford's consultants failed to satisfy this standard.  They disregard the

conclusions of all of plaintiff's long-time treating physicians and recognized experts in their

fields, without explanation.  According to her physicians, she is totally disabled as a result of a

variety of debilitating symptoms, including: cognitive impairment, fatigue and pain, all of which are well-documented throughout her medical records and supported by the objective testing mentioned in the FACTUAL BACKGROUND section above.

In addition to the cognitive impairments detailed by Drs. Shea, Shoemaker and Levine, many of which would, in and of themselves, interfere with plaintiff's ability to work, plaintiff's physicians described specific physical work-related functional limitations she experiences as a result of the above-mentioned symptoms, including limitations related to:

- Sitting — cannot sit without needing to stretch or move every 15 mins. (HAR 00276)
- Lifting — could lift 15 lbs. once or twice, but not repeatedly. (HAR 00276)
- Stooping/squatting — could not maintain position for long without becoming unstable. (HAR 00276)
- Standing — cannot stand for more than 15 mins. without needing to rest at least 15 mins., including lying down. (HAR 00277)
- Walking — cannot walk for more than 15 mins. without needing to rest at least 15 mins., including lying down. (HAR 00277)
- Grasping, pushing, pulling – can do occasionally, with frequent rest periods, but not repeatedly. (HAR 00277)

Hartford's consultants, however, blatantly disregarded such reports. Indeed, in his rebuttal report, dated December 29, 2006, Dr. Shoemaker, in reviewing the materials sent to him by defendant, stated, "It is clear to me that the objective laboratory findings in this case have been discarded or not considered." (HAR 00275) In addition, Dr. Shoemaker expressed his concern that "none of the third party reviewers from Hartford recorded a complete list of the symptoms that are disabling for [Jacoby] to this day nor did any physician bother to look at her marked abnormalities in innate immune responses documented by lab tests done by nationally accredited, CLIA approved, high complexity laboratories." (HAR 00275).

    d.   Hartford's Consultants Failed to Properly Credit Plaintiff's
          Credible Complaints of Fatigue and Pain

An insurer is obligated to credit a claimant's credible complaints of fatigue and

pain. *See Connors v. Connecticut General Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001); *Chan*

*v. Hartford Life Ins. Co.*, 2004 U.S. Dist. LEXIS 17962, *23 (S.D.N.Y. 2004). Moreover, an

insurer cannot apply an "objective" standard of proof that makes it impossible to establish

disability. As Chief Judge Posner stated in *Hawkins v. First Union Corp. Long-Term Disability*

*Plan*, 326 F.3d 914, 918 (7th Cir. 2003):

> But the gravest problem with Dr. Chou's report is the weight he places on the
> difference between subjective and objective evidence of pain. Pain often and in
> the case of fibromyalgia cannot be detected by laboratory tests. The disease itself
> cannot be detected by laboratory tests. The disease itself can be diagnosed more
> or less objectively by the 18-point test (although a canny patient could pretend to
> be feeling pain when palpated at the 18 locations — but remember that the
> accuracy of the diagnosis of Hawkins' fibromyalgia is not questioned), but the
> amount of pain and fatigue that a particular case of it produces cannot be. It is
> "subjective" – and Dr. Chou seems to believe, erroneously because it would mean
> that fibromyalgia could never be shown to be totally disabling, which the plan
> does not argue, that because it is subjective, Hawkins is not disabled.

*See also Lemaire v. Hartford Life and Accident Ins. Co.,* 2003 U.S. App. LEXIS 13421, *13 (3d

Cir. 2003) ("To require 'objective' medical evidence to establish the etiology of [CFS], which is

defined by the absence of objective medical evidence…creates an impossible hurdle for

claimants and is arbitrary and capricious."); *Sansevera v. E.I. DuPont de Nemours & Co., Inc.*,

859 F. Supp. 106, 113 (S.D.N.Y. 1994) ("When confronted with an illness that is admittedly

difficult to diagnose, it is unreasonable to demand evidence of a specific kind of impairment after

experts have concluded that no definitive test for CFS has yet been discovered.").

          Hartford's consultants failed this standard. A prior consultant, who approved

plaintiff's claim, acknowledged both the severe symptoms that plague plaintiff and the highly

demanding occupation that she must be well enough to perform. For example, a Hartford diary

note, dated June 29, 2005, recounted a phone conversation in which plaintiff told Hartford's representative that she could "stand/walk 15-30 minutes max before needs to sit down," could sit "1 hour before needs to lay down.  Has pain in neck/hip/head.  If cleans kitchen had to be in bed all day for day or two," "cant exercise," "cant vacuum."  (HAR 00112-HAR00113).  However, the subsequent evaluations simply rejected out of hand plaintiff's self-reported symptoms and ignored the extremely demanding requirements of her position.  Those failures render their opinions insubstantial.

Hartford failed to credit plaintiff's credible complaints.  Dr. Siegel concedes that plaintiff has long complained of and been treated for numerous symptoms, such as pain and fatigue, that are associated with chronic fatigue syndrome.  These symptoms are not only described by plaintiff, but are corroborated by her treating physicians.  Despite this evidence, however, Dr. Siegel concludes that plaintiff's "subjective complaints . . . far outweigh objective physical examination, laboratory or imaging studies."  (HAR 00547).[10]  While admitting that abnormalities existed with respect to plaintiff's labwork and neurological imaging studies, Dr. Siegel dismissed these, saying that there is "no indication of a serious neurologic condition or disorder, which would be expected, however, to interfere with her ability to perform work activities . . . "  (HAR 00548).  Thus, Dr. Seigel ignores established Second Circuit law, and then sets up a standard of disability that requires denial of a claim unless the claimant can objectively quantify fatigue and pain, which can <u>never</u> be done.  Dr. Siegel's standard, which requires a plan participant to objectively prove that which can only be proven subjectively, epitomizes arbitrariness and capriciousness.

---

[10]  Dr. Siegel cites no scientific basis for using the objective tests as a means of assessing benchmarks of Jacoby's complaints of pain and fatigue.  His conclusion that her complaints "far outweigh" the objective tests is expert opinion by fiat.

e.  Hartford's Doctors' Reports are Conclusory

A conclusory opinion is not substantial evidence. *Kumho Tire*, 526 U.S. at 157. ("Opinion evidence that is connected to existing data only by the ipse dixit of the expert" should not be admitted.). *See also Abrams v. Cargill,* 395 F.3d at 887.

Dr. Levy.  Dr. Levy concludes that he cannot define why the patient is disabled, because she "appears to be able to walk, sit, drive a motor vehicle, and she can bend and kneel and over several days was observed to do normal chores that everybody does."  (HAR 00674). Dr. Levy, however, does not explain why any of these abilities scientifically indicate that Jacoby could work full time at an occupation for which she is qualified, earning over $31,500.  He, furthermore, does not address Jacoby's complaints of cognitive deficits and unpredictable pain and fatigue.  He only dismisses them as subjective.  He does not explain why he comes to a different conclusion than Jacoby's treating physicians.  He offers no opinion whether these subjective symptoms, which have been extensively corroborated by Jacoby's treating physicians, would, if true, render her unable to work full-time.

Dr. Sniger.    Dr. Sniger's report is replete with conclusory opinions that remain unexplained and unsupported:  (a) Dr. Sniger never explains why Ms. Jacoby's activities recorded on the videotape scientifically establish that she could work full-time in an occupation for which she is qualified, earning over $31,500; (b) Dr. Sniger never addresses Dr. Noran's neuropsychological report which detailed Ms. Jacoby's significant cognitive deficits; instead he mistakenly calls it a "Psychological Evaluation" and ignores the GAF of 45;[11] and (c) Dr. Sniger never explains why he opines that Ms. Jacoby "could lift/push/pull 10 lbs of weight occasionally, reach frequently, and sit, finger, feel and handle constantly, as he stated in his report.  Dr.

---

[11] The DSM IV, at p. 32, specifies that a GAF range of 41-50 means, *inter alia*, "serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job."

Sniger's *ipse dixit* pronouncements, masquerading as expert opinion, are not substantial evidence.

Dr. Siegel. While admitting he has "no indication what Ms. Jacoby does on a typical day or day-to-day basis," Dr. Siegel concludes that plaintiff is independent with her activities of daily living. (HAR 00548). He arbitrarily concludes that plaintiff is able to perform "full-time sedentary-light physical demand work activities on a consistent basis." (HAR 00549). Without giving any explanation as to how he comes up with his recommendations, however, or any idea as to where a job fitting these restrictions might exist in the real world, he opines that:

> physical restrictions initially appear medically necessary and appropriate. The physical restrictions could include a zero to 10-pound lifting restriction, alternating sitting and standing, frequent rotation of job tasks and activities, and avoidance of prolonged sitting, standing or walking activities . . . The ability to self-regulate during the workday is also suggested . . . A highly structured work environment with supervision is recommended  . . ."

(HAR 000549).

Dr. Garrido-Castillo. While acknowledging the conclusions of Drs. Rosen Noran and Shea that plaintiff is disabled due to cognitive deficits as a result of her chronic fatigue syndrome and that his paper review is, by its nature, limited, Dr. Garrido-Castillo opines without any support that "plaintiff's current level of neuropsychological functioning does not preclude her returning to work." (HAR 00562). Contrary to Dr. Siegel who "signed off" on plaintiff's physical abilities, Dr. Garrido-Castillo states that, "to the extent that **significant difficulties exist to her returning to work** they are due to her physical condition, not necessarily her psychological or neuropsychological condition." (HAR 00562) (emphasis added). Thus, on the one hand, Dr. Garrido-Castillo acknowledges that, even according to his lax standards, plaintiff "showed relative deficits in reading accuracy and some aspects of visual processing" as well as "difficulties with some areas of her cognitive functioning related to deficiency of processing

information and also with respect to her ability to handle relatively complex information."
(HAR 00562-00563).  On the other hand, Dr. Garrido-Castillo states, "I do not believe the extent
of these deficits is significant to preclude the claimant from returning to work on the basis of her
psychological and neuropsychological functioning" and opines that "a trial return to work under
structured and supervised conditions may be indicated."  (HAR 00562-00563).  These
conclusions come out of thin air.

    f. <u>Hartford's Consultants Unreasonably Failed To Consider The Determination</u>
      <u>Of The Social Security Administration</u>

    The Social Security Administration determined that Jacoby was disabled from
working in any occupation and has paid benefits to her since December 2002.  (HAR 01047-
01050).  Hartford had received notice of the SSA's determination prior to discontinuing Jacoby's
benefits.  *See, Zurndorfer v. UNUM Life Ins. Co. of Am.,* 2008 U.S. Dist. LEXIS 26278, *53-54
(S.D.N.Y. 2008) ("Even if Unum had not actively aided Zurndorfer in obtaining SSDI benefits
under  [*54] an arguably more exacting standard of disability, its failure to address the SSA's
contrary determination is at least some evidence that the Unum's decision was arbitrary and
capricious."); *Mikrut v. UNUM Life Ins. Co. of Am.*, 2006 U.S. Dist. LEXIS 92265 (D. Conn.
Dec. 20, 2006) (failure to credit the positive determination of the SSA is evidence that an insurer
was, in fact, influenced by its inherent conflict of interest).  Hartford actually went out of its way
to explain why it intentionally disregarded the SSA's determination in its April 23, 2007 denial
letter to plaintiff, saying,

> You may feel that receipt of benefits from the Social Security Administration
> provides additional corroboration of Ms. Jacoby's claim for total disability.  It is
> our position, that the LTD provider retains the right to investigate and administer
> benefits in accordance with the terms of the applicable policy and to render
> decisions independent of the decisions of government agencies, employers and
> other providers of insurance.

(HAR 00581)  Accordingly, Hartford erred in not crediting the SSA's determination.

        g.   <u>Hartford's Consultants Unreasonably Relied on Unrepresentative and
Unreliable Videotape Surveillance of Plaintiff</u>

Each consultant of Hartford relied heavily on the videotape surveillance performed on Jacoby.  Because that video surveillance was unrepresentative and unreliable, each consultant's report is tainted and unreliable.  Videotape surveillance that depicts minimal activity or that lasts for a short period of time is not substantial evidence.  *See, e.g., Hanusik v. Hartford Life Ins. Co.*. 2008 U.S. Dist. LEXIS 7520 at *11-12 (E.D. Mich. 2008) (citations omitted), in which the Court found video surveillance footage of plaintiff irrelevant to the issue of plaintiff's ability to work:

> . . . Hartford's reliance on the video surveillance of Plaintiff in deciding to terminate her LTD benefits was neither reasonable nor rational.  Hartford makes much of the fact that it captured footage of Plaintiff in the acts of, among other things, walking for about a mile on five occasions for about half an hour; operating a car on five occasions; going to church on two occasions; and scratching her back on two occasions.  However, it was never alleged that Plaintiff was unable to do any of these activities. . . . Dr. Slain indicated that Plaintiff was unable to do all of those activities on the same day for a continuous period of eight or four hours. . . . Similarly, plaintiff's family members indicate that Plaintiff is unable to function on a particular day if she exerts too much energy on the previous day. . . . However, the video surveillance fails to show Plaintiff either performing any single or combination of activities for an eight or four hour period, or strenuously exerting herself over the course of two consecutive days.

*See also Winter v. The Hartford Life and Accident Ins. Co.*, 2004 U.S. Dist. LEXIS 4550 *15 (E.D.N.Y. 2004) ("In the Court's view, the surveillance video alone, which was approximately twenty minutes in duration and purports to represent two full days of activity, does not constitute substantial evidence supporting the denial of long term disability benefits."); *Chan v. Hartford Life Ins. Co.*, 2004 U.S. Dist. LEXIS 17962 *28 (S.D.N.Y. 2004) (footage depicting a claimant

"walking, riding in a car, and even briefly shuffling papers, do not substantially address her ability to perform her prior occupation.").

        Hartford's videotapes are, on their face, insufficient to support a discontinuation of benefits. The videotapes, curiously, cover only a small fraction of the time that plaintiff was allegedly under surveillance.[12]  For example, out of the first three full days of surveillance conducted, a grand total of only 24 seconds of videotape was obtained. (HAR SIU 36).  In addition, the reports of the surveillance do not detail times of activities, such that it is impossible to tell how much time plaintiff spent outside her home. (HAR SIU 105-108).  Critically, on the day when plaintiff was active for the longest time, driving for two hours to her brother's house, she told the investigator that she had made an extraordinary effort on that day to see her brother on his deathbed.  As she describes in her statement:

> The surveillance video filmed me in my vehicle for two hours as I headed to New England on Interstate 95.  What is absent from the film is the extraordinary reason for the trip.  My mother and I were on our way to hug my brother for the last time. The fatal disease of ALS permitted us one final visit with him.  What is absent from the video is how I was lying in a bed in a hotel room for 2 days after arriving in Westfield, Massachusetts and staying at my brother's bedside for 1 precious hour.  The surveillance did not show me beginning antibiotic treatment upon arriving at Steve's bedside, as infection had set in from the exertion of driving. Nor did it catalogue the severe toll the trip took on my body upon my return home necessitating days of being bedridden.

(HAR 00217, 00435).

        Moreover, the videotapes show short snippets of activity.  Thus, the videotapes shed absolutely no light on what plaintiff was doing, or was not doing, during the vast majority of the time of the surveillance.  Indeed, in combination, the videotapes do not show plaintiff doing enough walking, standing and sitting to indicate the ability to do the requirements of a

---

[12]  In this case, Hartford relies upon less than 10 minutes of actual video of plaintiff while having contracted to have her under surveillance for 40 hours.

sedentary job even on a part-time basis. The timeframes of the videotapes are far too short to extrapolate plaintiff's functional capacity in an 8-hour day and 40-hour week.

Given the abbreviated nature of the videotapes, one must wonder if the videotapes were selectively edited. One must further wonder if the doctors really reviewed the actual videotape or merely read the misleading report of Hartford's investigator.

   B.   Hartford Failed To Provide Plaintiff With A Full And Fair
        Review

To protect the rights of participants and beneficiaries, the Court must assess and review the fiduciary's conduct to determine whether it is worthy of the Court's deference and trust. Failure to provide a full and fair review renders a decision arbitrary and capricious. *See, e.g., Crocco v. Xerox Corp.,* 137 F.3d 105, 108 (2d Cir. 1998); *Hammer v. First UNUM Life Ins. Co.,* 2004 U.S. Dist. LEXIS 16893, *12 (S.D.N.Y. 2004); *Cook v. The New York Times Co. Group LTD Plan,* 2004 U.S. Dist LEXIS 1259 (S.D.N.Y. 2004); *Connell v. The Guardian Life Ins. Co. of America Severance Plan,* 2003 U.S. Dist LEXIS 10628, *6 (S.D.N.Y. 2003).

The Department of Labor Regulations require a denial letter to include a "description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. §2560.503-1(g)(1)(iii). *See Cook,* 2004 U.S. Dist LEXIS 1259 at *36 ("To satisfy the requirement of a description of any additional material or information necessary for the claimant to perfect the claim, the letter would have to specify the kind of additional medical information needed.").

Hartford failed to satisfy this requirement to plaintiff's detriment. In its discontinuation letter, Hartford failed to explain why the information plaintiff submitted was inadequate. Why was Dr. Levine's report inadequate? What did Dr. Shoemaker omit? What

was <u>specifically</u> missing?  Hartford never explained.  If Hartford had explained, Jacoby would

have been in the position of going back to her physicians and obtaining any such missing

information.  Instead, the best she was able to do was guess.

         Hartford's February 2, 2007 letter merely stated:  "Ms. Jacoby is most welcome to

submit any new medical information that has not been previously submitted and reviewed by the

Hartford as part of her appeal."  Not only was that exceedingly general and, thus, unhelpful, but

Hartford entirely abdicated its responsibility to provide plaintiff guidance on how to perfect her

claim.  Hartford simply told plaintiff to send in <u>whatever she deemed appropriate</u>, rather than

what Hartford deemed necessary to perfect the appeal.  ERISA and the governing caselaw forbid

insurers from "hiding the ball," as Hartford did here, precisely to ensure that claimants are not

subjected to sham appeals.  Plaintiff was prejudiced by Hartford's failure to explain why her

claim was deficient and by Hartford's refusal to provide any explanation of what information she

needed to submit to perfect her claim.

         Once Jacoby submitted her appeal, Hartford then sandbagged her by having two

doctors review her appeal without giving her an opportunity to respond.  An insurer may not

"sandbag" a claimant by failing to permit the claimant to review and comment upon all

documents, records and information relevant to the claim.  *See Abram v. Cargill, Inc.*, 395 F.3d

882, 886 (8th Cir. 2005) ("The process used by the Plan was not consistent with a full and fair

review.  Abram was not provided access to the second report by Dr. Gedan that served as the

basis for the Plan's denial of benefits until after the Plan's decision); *Cook*, 2004 U.S. Dist.

LEXIS 1259 at *37 ("The denial of plaintiff's first appeal was based on deficiencies in plaintiff's

submissions that had never been communicated to her in MetLife's initial letter, and that she had

never been given the opportunity to cure.  A denial of an appeal that is based on insufficient

notice as to how the claim might be perfected fails to meet the requirements of ERISA and its implementing regulations, and is therefore unreasonable as a matter of law.").

In the instant case, Jacoby is in the same position as the plaintiffs in *Abram* and *Cook*. The April 23, 2007 final denial relied on reports by Drs. Siegel and Garrido-Castillo to which Jacoby neither had access nor an opportunity to rebut.

<u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for summary judgment should be denied.

Dated:  New York, New York
        April 18, 2008

RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 2430
New York, New York 10165
(212) 297-0700


By:_____
    Scott M. Riemer (SR5005)

31

<u>CERTIFICATE OF SERVICE</u>

 I hereby certify that I am attorney for Plaintiff and that, on April 18, 2008, I electronically filed a copy of PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and served a true and correct copy of same by FedEx on the following:

    Christina H. Bost Seaton
    Troutman Sanders LLP
    The Chrysler Building
    405 Lexington Ave.
    New York, New York 10074
    212-704-6000

Dated: New York, New York
   April 18, 2008

            SCOTT M. RIEMER (SR5005)\
            RIEMER & ASSOCIATES LLC
            60 East 42nd Street, Suite 2430
            New York, New York 10165
            (212) 297-0700