RIEMER & ASSOCIATES LLC
Attorneys for Plaintiff
Office and Post Office Address
60 East 42nd Street, Suite 2430
New York, New York 10165
(212) 297-0700

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| JULIE JACOBY, | 07 CV 4627 (LAK) (RLE) |
| Plaintiff, | PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT |
| -against- | PURSUANT TO <u>LOCAL RULE 56.1</u> |
| HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, | |
| Defendant. | |

-----------------------------------------------------------------X

          Plaintiff, by her attorneys, Riemer & Associates LLC, submits this

Statement in response to Hartford Life And Accident Insurance Company's ("Hartford")

Statement pursuant to Local Rule 56.1, dated March 11, 2008, as follows:

<u>General Objections</u>

          Rather than being a short and concise statement of material facts where

there is no genuine issue to be tried, defendant's 56.1 Statement is a lengthy statement

full of argument.  The fact that defendant needed <u>125</u> argument-filled paragraphs to make

its statement, by itself, shows that this case is not appropriate for summary judgment.

<u>Responses</u>

1.     Admits.

2.     Admits.  (HAR POLICY 25-26).[1]

3.     Admits.  (HAR POLICY 41).  While the language of the policy states that Hartford has discretionary authority to decide entitlement to benefits, as asserted in the parties' Joint Pretrial Order and Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, this does not mean that the arbitrary and capricious standard of review applies.  Granting deference to the determination of a conflicted insurance company deprives plaintiff of her constitutional right to have her "private right" to long term disability benefits adjudicated under the judicial power of an Article III Court.  Granting any level of deference to Hartford under the arbitrary and capricious standard of review would be a constitutionally impermissible relegation of judicial power.  Additionally, Hartford was, in fact, influenced by its inherent conflict of interest as evidenced by its disregard of the opinions of Jacoby's treating physicians, disregard of Jacoby's complaints of pain and fatigue, disregard of the determination of the Social Security Administration, its hiring of a beholden consulting firm to conduct "independent" medical reviews, and its reliance on a reviewing doctor who (contrary to the consensus in the medical community) denies the validity of chronic fatigue syndrome and fibromyalgia.

4.     Admits.  (HAR 1278).

---

[1]  "HAR ___," "HAR POLCY ___" and "HAR SIU" refer to the Bates-stamped pages of the administrative record provided by defendant.  Plaintiff makes no representations as to the completeness and accuracy of the administrative record as compiled by defendant.

5.     Admits, but the Court is referred to the Employer's Statement accompanying plaintiff's Application for Long Term Disability Benefits for a complete and accurate assessment of its contents.  (HAR 1279-1280).  Moreover, Hartford fails to describe the cognitive requirements of the occupation.

6.     Admits, but the Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents.  (HAR 363-366).  Dr. Levine is a nationally recognized expert on Chronic Fatigue Syndrome.

7.     Admits, but the Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents.  Id.

8.     Admits, but the Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents.  Id.

9.     Admits, but the Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents.  Id.

10.     Admits.  (HAR 1211-1212).  Plaintiff objects to the characterization of tilt table studies, particularly Hartford's reliance on a website pertaining to heart disease.  The Social Security Administration (the "SSA") has determined that a finding of "neurally mediated hypotension as shown by tilt table testing establishes the existence of a medically determinable impairment in individuals with CFS."  (SSR 99-2p, 64 FR 23382 (April 30, 1999)).

11.     Admits that Plaintiff had a "vasovagal response to upright tilt." The significance of that finding was that the test elicited "neurally mediated hypotension" within the meaning of SSR 99-2p.

12.    Denies.  To combat the "vasodepressor syncope" found on the tilt table study, Dr. Levine recommended "fluid and salt" and elevation of the legs.  (HAR 361).  The finding shows impairment pursuant to SSR 99-2p.  If defendant's consultants were experts on chronic fatigue syndrome, they would have known this.

13.    Admits.  (HAR 1217).  Pursuant to SSR 99-2p, an abnormal MRI brain scan establishes "the existence of a medically determinable impairment in individuals with CFS."

14.    Admits, but the Court is referred to the MRI and its accompanying Impressions for a complete and accurate assessment of its contents.  Id.  The abnormal finding of the MRI was sufficient to establish a finding of impairment under SSR 99-2p.

15.    Denies.  Dr. Levine diagnosed plaintiff with chronic fatigue syndrome based on a combination of (i) past labwork "which essentially excluded other causes of fatigue, such as hypothyroidism or hypocortisolemia . . .;" (ii) abnormal neurological imagining studies and laboratory work, including (a) an abnormal MRI and (b) a "blunted" growth hormone response; (iii) Dr. Levine's physical examinations of plaintiff which demonstrated the presence of trigger points; and (iv) her subjective complaints.  (HAR 362-366).

16.    Denies.  The Court is referred to plaintiff's response to ¶15.

17.    Admits that Dr. Levine recommended such a consult, but the Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents. (HAR 362).  Plaintiff objects to Defendant's characterization of the MRI results as "slightly abnormal."

18.    Admits, but the Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents.  (HAR 360-361).

19.    Denies.  Dr. Levine had referred to and investigated the possibility of a growth hormone deficiency as early as her first visit with plaintiff.  Moreover, Dr. Levine identified trigger points across plaintiff's back and shoulders during each physical examination of plaintiff during November and December 2002.  (HAR 360-366).

20.    Admits, but the Court is referred to Dr. Levine's notes as well as the Brain SPECT scan and its accompanying Impressions for a complete and accurate assessment of their contents.  (HAR 360, 368-369).  Plaintiff objects to Hartford's use of expert information that is not in the record.

21.    Admits, but the Court is referred to the Brain SPECT scan and its accompanying Impressions for a complete and accurate assessment of their contents. (HAR 368-369).

22.    Admits, but the Court is referred to the Brain SPECT scan and its accompanying Impressions for a complete and accurate assessment of their contents. (HAR 368-369).

23.    Denies.  First, Hartford's consultant, Dr. Siegel, who is employed by UDC, which maintains a long and fruitful financial relationship with Hartford — one that has drawn scrutiny from courts — is not "independent."  (P. Brief at 12-14).  Second, Dr. Siegel did not say that the results of the SPECT scan were not related to any of plaintiff's subjective complaints of disabling symptoms.  Rather, he stated that there was "no indication . . . that [Plaintiff] . . . has a serious neurologic condition or disorder, which would be expected . . . to interfere with her abilities to perform work activities in a

highly structured environment with supervision." (HAR 548). The Court is referred to Dr. Siegel's report for a complete and accurate assessment of its contents. (HAR 534-550). Third, with respect to defendant's reference to HAR 791, that is part of Dr. Sniger's report. Dr. Sniger draws no such conclusion regarding the SPECT scan. In fact, the only context in which he mentions the SPECT scan is in saying that plaintiff had two abnormal SPECT scans, in 2002 and 2004. (HAR 787, 791). The Court is referred to Dr. Sniger's report for a complete and accurate assessment of its contents. (HAR 785-792).

24.    Denies. Plaintiff was referred to Dr. Gage to assess her apparent growth hormone deficiency, but the Court is referred to Dr. Levine's notes and Dr. Gage's letter for a complete and accurate assessment of their contents. (HAR 360, 1141).

25.    Denies. Dr. Gage states that Plaintiff has a "blunted growth hormone" which appears to be separate from her (i) oligoamenorrhea; (ii) history of chronic fatigue syndrome; and (iii) possible renal insufficiency. The Court is referred to Dr. Gage's letter for a complete and accurate assessment of its contents. (HAR 1141).

26.    Denies. The MRI was performed, and certain brain abnormalities were noted. The Court is referred to the MRI and its accompanying Impressions for a complete and accurate assessment of their contents. (HAR 1139-1140).

27.    Denies. Plaintiff saw Dr. Rosen Noran, but the reference given by Defendant is incomplete; it is clearly the first page of a multi-page report, and it does not give the source of the referral. Moreover, Dr. Rosen Noran states that she saw plaintiff because of "severe deficits in functioning, a long standing, debilitating depression" (not simply plaintiff's claims of same) and "to determine her capacities." (HAR 1030). The

Court is referred to Dr. Rosen Noran's report for a complete and accurate assessment of its contents.

28.    Admits.

29.    Admits, but the Court is referred to Dr. Rosen Noran's report for a complete and accurate assessment of its contents.  (HAR 1030).

30.    Admits that Dr. Rosen Noran made these Axis I and II diagnoses. (HAR 1030).  She also, however, assessed Plaintiff as having chronic fatigue syndrome and fibromyalgia, pursuant to Axis III.  Id.  Since only the first page of a multi-page report is referenced, it is unknown whether further treatment was recommended by Dr. Noran.  Id.

31.    Admits that plaintiff ceased working on December 20, 2002. However, Dr. Levine gives a primary diagnosis of chronic fatigue syndrome and secondary diagnoses of fibromyalgia and growth hormone deficiency and lists multiple subjective symptoms, including severe exhaustion, muscle pain and memory problems. The Court is referred to Dr. Levine's Attending Physician's Statement for a complete and accurate assessment of its contents.  (HAR 1295-1296).

32.    Admits, but the Court is referred to Dr. Levine's and Dr. Enlander's Attending Physician's Statements for a complete and accurate assessment of their contents.  (HAR 1293-1296).

33.    Admits, except both physicians also placed restrictions and limitations on plaintiff's ability to reach/work overhead, push, pull, and use a keyboard/repetitive hand motion.  The Court is referred to Dr. Levine's and Dr.

7

Enlander's Attending Physician's Statements for a complete and accurate assessment of their contents. (HAR 1293-1296).

34.     Admits. Defendant's letter states, however, that, as of June 21, 2006, the definition of disability will change from "own occupation" to "any occupation," not that Plaintiff would need to establish that she was prevented from performing the duties of any occupation. There is no specific proof requirement mentioned. (HAR 64-66).

35.     Admits, but the Court is referred to the MRI and its accompanying Impressions for a complete and accurate assessment of their contents. (HAR 917-918).

36.     Admits, but the Court is referred to the MRI and its accompanying Impressions for a complete and accurate assessment of their contents. Id.

37.     Admits, but the Court is referred to Dr. Levine's note for a complete and accurate assessment of its contents. (HAR 353).

38.     Denies. While there is a break in Dr. Levine's notes between October 2003 and July 2004, this is not conclusive evidence that Plaintiff did not see her during this time. As there is nothing in the notes indicating a break in treatment, the lack of notes may be due to a clerical error on the part of either (i) Dr. Levine's office or (ii) defendant, who compiled the administrative record. The Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents. (HAR 348-349).

39.     Denies. Dr. Podell saw plaintiff on a regular basis from November 2003 through July 2005. (HAR 206). He physically examined Plaintiff and ordered objective medical tests as necessary. The conclusions he made regarding plaintiff's disability (HAR 997-999) were based on these examinations and tests. The Court is

referred to Dr. Podell's notes for a complete and accurate assessment of their contents. (HAR 951-994).

40.     Denies.  The Court is referred to plaintiff's response to ¶39.  In addition, it is noteworthy that Hartford's Physical Capacities Evaluation Form never asks about objective testing performed.  The Court is referred to the Physical Capacities Evaluation Form completed by Dr. Podell for a complete and accurate assessment of its contents.  (HAR 997-999).

41.     Denies.  Plaintiff underwent another MRI, and the MRI again demonstrated an abnormality in her brain.  As the MRI Impressions simply report the abnormal findings of the MRI, no correlation is drawn therein between the MRI's findings and plaintiff's symptoms.  (HAR 906-907).  This is not tantamount to saying no correlation exists.  The Court is referred to the MRI and its accompanying Impressions for a complete and accurate assessment of their contents.  Id.

42.     Denies.  The SPECT scan Impressions specifically state that, despite showing an improvement over an earlier SPECT scan, the findings remained abnormal.  The Court is referred to the SPECT scan and its accompanying Impressions for a complete and accurate assessment of their contents.  (HAR 370-371).

43.     Admits, but the Court is referred to Dr. Mauskop's letter for a complete and accurate assessment of its contents.  Dr. Mauskop's letter specifies that "the patient appears to have chronic fatigue syndrome and fibromyalgia." (HAR 894-895).

44.     Admits, but the Court is referred to Dr. Mauskop's letter for a complete and accurate assessment of its contents.  Id.

45.     Admits, but, significantly, Dr. Mauskop also observed "muscle spasm . . . on palpitation in suboccipital, paraspinal cervical and trapezii muscles." The Court is referred to Dr. Mauskop's letter for a complete and accurate assessment of its contents. Id.

46.     Admits, but Dr. Podell also noted restrictions relating to Plaintiff's ability to lift/carry, push/pull, reach, finger and repetitively use her hands and feet. The Court is referred to the Physical Capacities Evaluation Form completed by Dr. Podell for a complete and accurate assessment of its contents. (HAR 949-950).

47.     Denies. The Court is referred to plaintiff's response to ¶39.

48.     Admits. (HAR 548). Plaintiff wishes to make clear, however, the fact that Functional Capacity Evaluations are not normally undergone unless an insurer requests it. Hartford did not request that plaintiff undergo such an evaluation either before or after its September 2003 approval of her application for long term disability benefits. Additionally, the reliability of such evaluations in the context of patients suffering from chronic fatigue syndrome and fibromyalgia is highly suspect at best. Patients with chronic fatigue syndrome suffer from "postexertional malaise lasting more than 24 hours." (SSR 99-2p at 23381). Functional Capacity Evaluations only last a couple of hours and, therefore, do not assess the patient's condition following activity.

49.     Denies. Defendant improperly draws a factual conclusion that no objective testing explained plaintiff's symptoms. Throughout the past few years, a multitude of objective tests, labwork and bloodwork have yielded abnormal results. It is clear that each of plaintiff's treating physicians felt that these objective tests were related to her constellation of experienced symptoms. Plaintiff did continue to see Dr. Levine

10

during 2005. The Court is referred to Dr. Levine's notes for a complete and accurate assessment of their contents. (HAR 329-339).

50.    Admits, except plaintiff also described symptoms of muscle and joint pain/weakness, gastrointestinal upset, headaches and shortness of breath. (HAR 923). Of significant note is her statement that she needs assistance with numerous activities of daily living. (HAR 924). The Court is referred to the Claimant Questionnaire and accompanying documents for a complete and accurate assessment of their contents. (HAR 921-938).

51.    Admits, except Dr. Levine also stated that plaintiff was incapable of fingering and repetitive use of her hands and feet. (HAR 873-874). The Court is referred to the Physical Capacities Evaluation Form completed by Dr. Levine for a complete and accurate assessment of its contents. Id.

52.    Admits. (HAR 824-834).

53.    Denies the accuracy and reliability of the surveillance report as well as any videotape obtained. The videotape covers only a small fraction of the time that plaintiff was allegedly under surveillance. The report shows that, out of more than 25 hours of surveillance over a period of three days, a grand total of 24 seconds of videotape was obtained. Id. Moreover, on two of the three days of surveillance, Hartford's investigator detected no activity by Plaintiff. Id. The Court is referred to the surveillance report for a complete and accurate assessment of its contents. Id.

54.    Denies the accuracy and reliability of the surveillance report as well as any videotape obtained. Out of a total of ten hours of surveillance conducted on December 6, 2005, Plaintiff was outside her home for approximately two hours. (HAR

819-821). The report does not say how much videotape was obtained. The report does

not and cannot prove the weight of anything carried by plaintiff. Nor can it prove what

kind of pain and fatigue plaintiff experienced either during or after any observed activity.

Defendant uses inflammatory words such as "quickly," "easily," and "rapidly" — words

which do not appear in the investigator's report or in Dr. Sniger's review of the videotape

— to describe plaintiff's activity. (HAR 819-821, 790-791). The videotapes show short

snippets of activity, and, curiously, cover only a small fraction of the time that plaintiff

was allegedly under surveillance. Thus, the videotapes shed absolutely no light on what

plaintiff was doing, or was not doing, during the vast majority of the time of the

surveillance. Indeed, in combination, the videotapes do not show plaintiff doing enough

walking, standing and sitting to indicate the ability to do the requirements of a sedentary

job even on a part-time basis. The timeframes of the videotapes are far too short to

extrapolate plaintiff's functional capacity in an 8-hour day and 40-hour week. The Court is

referred to the surveillance report for a complete and accurate assessment of its contents.

Id.

        55.     Denies the accuracy and reliability of the surveillance report as

well as any videotape obtained. The Court is referred to plaintiff's response to ¶54.

        56.     Denies the accuracy and reliability of the surveillance report as

well as any videotape obtained. The Court is referred to plaintiff's response to ¶54.

        57.     Denies the accuracy and reliability of the surveillance report as

well as any videotape obtained. Admits that she drove non-stop for more than two hours

(HAR 822), but described that this trip was made under extenuating, one-time

circumstances. Plaintiff was traveling to see her brother, who was dying of ALS, for the

last time. (HAR 00217, 00435). In fact, the exertion of the trip necessitated her beginning a course of antibiotic treatment and remaining bedridden for several days afterward. Id. The Court is referred to the surveillance report for a complete and accurate assessment of its contents. (HAR 821-822).

58.    Denies the accuracy and reliability of the surveillance report, the videotape and Dr. Sniger's alleged "independent" review of same. The Court is referred to plaintiff's response to ¶54. Dr. Sniger's comments with respect to plaintiff appearing "of normal weight . . . fit . . . with normal strength, ROM [range of motion] and flexibility" and "show[ing] no signs of fatigue or discomfort" during videotaped activity are impossible to validate objectively and demonstrate his clear bias toward defendant. (HAR 791). It is noteworthy that Dr. Sniger never personally examined plaintiff; he merely reviewed her medical records and the surveillance videotape. The Court is referred to the surveillance report for a complete and accurate assessment of its contents. (HAR 817-834).

59.    Admits, but, in addition, plaintiff spoke to Dr. Shoemaker by phone at various points throughout 2006 and underwent a number of objective medical tests upon his advice. The Court is referred to Dr. Shoemaker's records for a complete and accurate assessment of their contents. (HAR 274-312).

60.    Admits that Dr. Shoemaker sent plaintiff for blood tests and labwork, a number of which yielded abnormal results. (HAR 274-312). While certain of the tests were "investigational," Dr. Shoemaker detailed that the abnormal results and the diagnosis of chronic fatigue syndrome were properly confirmed by numerous abnormal tests and neuroimaging studies as well as his personal examination of plaintiff and

investigation of her constellation of symptoms, which was wholly consistent with the Social Security Administration's criteria for chronic fatigue syndrome. The Court is referred to Dr. Shoemaker's records for a complete and accurate assessment of their contents. (HAR 274-312). Plaintiff denies the accuracy and reliability of Dr. Siegel's report and defendant's characterization of him as "independent." It is noteworthy that Dr. Siegel never personally examined plaintiff; he merely reviewed her medical records and the surveillance videotape. Moreover, as a hired gun for UDC, a consulting firm with established and suspect ties to Hartford, Dr. Siegel was operating under a financial incentive to find that Plaintiff was not disabled.

61.     Admits that she was interviewed by Mr. Budkus, but denies the accuracy and reliability of his report. The Court is referred to Mr. Budkus's report (HAR SIU 113-115) and to plaintiff's Continuing Disability Statement (HAR SIU 54-63) for a complete and accurate assessment of their contents.

62.     Admits that Mr. Budkus made the statements cited by defendant, but denies the accuracy and reliability of his report. Plaintiff has no knowledge of Mr. Budkus's background and can only assume that he is not a physician capable of accurately assessing/evaluating pain, discomfort, fatigue, cognitive impairment, range of motion, muscle definition, etc. In addition to the statements cited by defendant, Mr. Budkus stated, "The claimant did display pain indicators stating that she could not sit for the entire interview due to pain and weakness . . . approximately an hour into the interview the claimant stated that she needed to lie down because she was getting tired. The claimant initially sat on a high back wicker chair with a pillow behind her back for comfort. The claimant then changed from the wicker chair to the couch and she laid

down for most of the remaining interview.  (HAR SIU 114).  The Court is referred to Mr.

Budkus's report for a complete and accurate assessment of its contents.  (HAR SIU 113-

115).

   63. Admits that Mr. Budkus made the statements cited by defendant,

but denies the accuracy and reliability of his report.  The Court is referred to plaintiff's

response to ¶62.  Twice Mr. Budkus reported plaintiff saying that she "suffers from

cognitive and concentration difficulties."  (HAR SIU 114-115).  The Court is referred to

Mr. Budkus's report for a complete and accurate assessment of its contents.  (HAR SIU

113-115).  Again, plaintiff denies the accuracy and reliability of the surveillance report as

well as any videotape obtained.  The Court is referred to the surveillance report for a

complete and accurate assessment of its contents.  (HAR 817-834).

   64. Admits that she prepared such a statement.  However, in addition

to the symptoms and impairments cited by defendant, plaintiff also listed cognitive

impairment, muscle weakness and joint pain, muscle spasms, sore throats, tenderness in

neck, body temperature fluctuations, chemical sensitivities, sensitivities to light and noise

and pain from degenerative disc disease.  Moreover, she characterized her fatigue as

"incapacitating."  (HAR SIU 54.)  The Court is referred to plaintiff's Continuing

Disability Statement for a complete and accurate assessment of its contents.  (HAR SIU

54-63).

   65. Admits, but the Court is referred to plaintiff's Continuing

Disability Statement for a complete and accurate assessment of its contents.  (HAR SIU

54-63).

66.    Admits, but plaintiff stated that one change that had occurred within the previous six months was the herniation of discs in her back. (HAR SIU 59). The Court is referred to plaintiff's Continuing Disability Statement for a complete and accurate assessment of its contents. (HAR SIU 54-63).

67.    Admits that plaintiff made the quoted statement. The Court is referred to plaintiff's Continuing Disability Statement for a complete and accurate assessment of its contents. (HAR SIU 54-63). Again, plaintiff denies the accuracy and reliability of the surveillance report as well as any videotape obtained. In addition, plaintiff objects to the improper comparison of her written statement with the surveillance report and videotape, since, as stated above, (i) the videotape covers only a small fraction of the time that plaintiff was allegedly under surveillance; (ii) the videotapes show short snippets of activity, and, curiously, cover only a small fraction of the time that plaintiff was allegedly under surveillance; (iii) the report does not say how much videotape was obtained in total over the course of the two surveillance periods; (iv) the report does not and cannot prove the weight of anything carried by plaintiff; and (v) the report does not and cannot prove what kind of pain and fatigue plaintiff experienced either during or after any observed activity. Thus, the report and videotapes shed absolutely no light on what plaintiff was doing, or was not doing, during the vast majority of the time of the surveillance. Indeed, in combination, the videotapes do not show plaintiff doing enough walking, standing and sitting to indicate the ability to do the requirements of a sedentary job even on a part-time basis. The timeframes of the videotapes are far too short to extrapolate plaintiff's functional capacity in an 8-hour day and 40-hour week. The Court

is referred to the surveillance report for a complete and accurate assessment of its

contents.  (HAR 817-834).

       68.    Admits to making the statements cited by defendant.  (HAR SIU

56).  Again, plaintiff denies the accuracy and reliability of the surveillance report as well

as any videotape obtained.  In addition, plaintiff objects to the improper comparison of

her written statement with the surveillance report and videotape.  The Court is referred to

plaintiff's response to ¶67.  The Court is also referred to plaintiff's Continuing Disability

Statement (HAR SIU 54-63) and to the surveillance report (HAR 817-834) for a

complete and accurate assessment of their contents.

       69.    Admits, but the Court is referred to plaintiff's Continuing

Disability Statement for a complete and accurate assessment of its contents.  (HAR SIU

54-63).

       70.    Admits, but the plaintiff also stated that, if she twisted for a period

of time, her pain level would increase from 6 to 8, depending on the amount of twisting.

(HAR SIU 56).  The Court is referred to plaintiff's Continuing Disability Statement for a

complete and accurate assessment of its contents.  (HAR SIU 54-63).

       71.    Denies.  Plaintiff said that she "might" need assistance returning to

a standing position from a squatting position.  (HAR SIU 56).  The Court is referred to

plaintiff's Continuing Disability Statement for a complete and accurate assessment of its

contents.  (HAR SIU 54-63).

       72.    Admits, but plaintiff also said that, when she bends that amount,

she experiences dizziness or vertigo, and extreme pain from her lumbar discs which

would cause her to have to straighten or lie down and that her pain level would increase

from a 6 to an 8, depending on how long she bent. (HAR SIU 56). The Court is referred to plaintiff's Continuing Disability Statement for a complete and accurate assessment of its contents. (HAR SIU 54-63).

73.    Admits, but the Court is referred to plaintiff's Continuing Disability Statement for a complete and accurate assessment of its contents. (HAR SIU 54-63).

74.    Admits, but the Court is referred to plaintiff's Continuing Disability Statement for a complete and accurate assessment of its contents. (HAR SIU 54-63).

75.    Admits. (HAR SIU 62-63). Plaintiff also stated, however, that "the documented activities represent my above normal level of functionality during my daily activity" and that she was "extremely ill after this activity." (HAR 62). The Court is referred to plaintiff's Second Continuing Disability Statement for a complete and accurate assessment of its contents. (HAR SIU 62-63).

76.    Denies the accuracy and reliability of Nurse Cobb's report. In reaching her arbitrary conclusion that Plaintiff was able to perform "sedentary work," Nurse Cobb ignored and/or minimized (i) the opinions of all plaintiff's long-time treating physicians that she is disabled; (ii) plaintiff's subjective complaints of cognitive impairment, fatigue and pain; (iii) objective medical evidence, including abnormal neuropsychological testing, MRI's, brain SPECT scans, tilt table study, trigger points, labwork and bloodwork and (iv) the determination of the Social Security Administration that plaintiff was totally disabled from any occupation, focusing instead on the surveillance report and videotape. (HAR 101-103). The Court is referred to Nurse

Cobb's report for a complete and accurate assessment of its contents.  (HAR 101-103).

In her notes on Hartford's computer system, Nurse Cobb simply states that plaintiff is

able to perform "sedentary work" with no explanation as to what that means.  (HAR 101-

103).  In her letter to Dr. Levine, however, she states that plaintiff can perform at a "full-

time seated-type function, which will require only brief or intermittent periods of

walking/standing, and; allows for full use of the upper extremities, such as with fingering

and handling and typing.  Lifting/carrying will be limited to 0-10 lbs. on a frequent basis.

Sitting for the majority of the workday will be required, however, afforded will be the

opportunity to change body positions/postures as needed for comfort (by walking,

standing or moving about)."  The Court is referred to Nurse Cobb's computer notes

(HAR 101-103) as well as her letter to Dr. Levine (HAR 681-682) for a complete and

accurate assessment of their contents.

77.     Denies.  Nurse Cobb sends Dr. Levine the surveillance video, but

does not expressly ask her to comment on it.  The Court is referred to Nurse Cobb's letter

to Dr. Levine for a complete and accurate assessment of its contents.  (HAR 681-682)

78.     Admits that Dr. Levine wrote the quoted statements.  However, the

quoted passage as well as a passage tellingly admitted from her letter — "I think that

observing someone as the surveillance tapes have shows provides grossly inadequate

documentation as to the real capabilities of a given individual.  First of all, I don't know

just from the pictures provided whether she was able to perform these activities for more

than short bursts of time . . ." — show that Dr. Levine did, in fact, review the video

surveillance.  (HAR 313).  It is Dr. Sniger who reports that Dr. Levine told him that she

did not review the videotape.  (HAR 789).  The letter he refers to, however, which he

states summarizes his conversation with Dr. Levine is not included with his report. Plaintiff denies the accuracy and reliability of Dr. Sniger's report. The Court is referred to Dr. Levine's letter (HAR 313-314) and Dr. Sniger's report (HAR 785-792) for a complete and accurate assessment of their contents.

79.    Admits that Nurse Cobb said she was sending plaintiff's file "for peer review." (HAR 100). However, plaintiff questions whether such review was, in fact, independent, and Nurse Cobb does not say so in her note. The Court is referred to Nurse Cobb's notes for a complete and accurate assessment of their contents. Id.

80.    Admits that defendant obtained a "review" from Dr. Levy. (HAR 673-675). However, plaintiff denies the accuracy and reliability of Dr. Levy's report for several reasons. First, Hartford's reliance on Dr. Levy violated ERISA's mandate to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. 2560.503-1(h)(3)(iii). Dr. Levy is a neurologist. (HAR 00018). He is not an expert in chronic fatigue syndrome or fibromyalgia. Defendant, has, tellingly, repeatedly refused to produce his CV to plaintiff despite repeated requests. (P. Brief at 17-18; HAR 457-HAR 00458). Second, and perhaps most importantly, Dr. Levy is a denier of both chronic fatigue syndrome and fibromyalgia despite their recognition and classification by the Centers for Disease Control and the Social Security Administration. Dr. Levy tellingly admits in his report, "With respect to the diagnosis of chronic fatigue syndrome, I know that attempts have been made to codify that disorder. I always find it interesting to note that the 'diagnostic criteria' also fit the criteria in the DSM IV which is defined as an undifferentiated somatoform disorder. I also think that it is very interesting that no

20

definitive pathoanatomical correlate exists with chronic fatigue.  The cause of the disorder has never been identified.  There is no infectious agent that consistently has been found."  (HAR 00674)  While admitting that plaintiff had "tender points" upon physical examination by her treating physicians, Dr. Levy stated that "those are subjective and have no validity as it pertains to the diagnosis of fibromyalgia, which is just a name given to patients who have widespread aches and pains."  (HAR 00674).  Third, Dr. Levy never examined plaintiff and, furthermore, did not even review the full cadre of her medical records.  He admits in his report that he only reviewed Dr. Levine's records.  (HAR 00673).  The Court is referred to Dr. Levy's report for a complete and accurate assessment of its contents.  (HAR 673-675).

81.    Admits that Dr. Levy made the quoted statements.  Denies the accuracy and reliability of Dr. Levy's report.  The Court is referred to plaintiff's response to ¶80.

82.    Admits that Dr. Levy made the quoted statements.  Denies the accuracy and reliability of Dr. Levy's report.  The Court is referred to plaintiff's response to ¶80.

83.    Admits that Dr. Levy made the quoted statements.  Denies the accuracy and reliability of Dr. Levy's report.  The Court is referred to plaintiff's response to ¶80.

84.    Denies the accuracy, independence and reliability of Dr. Sniger's report.  First, Hartford's reliance on Dr. Sniger violated ERISA's mandate to "consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment."  29 C.F.R. 2560.503-1(h)(3)(iii).  Dr.

21

Sniger is Board-certified in Physical Medicine and Rehabilitation and Spinal Cord Injury

Medicine.  (HAR 00018).  He is not an expert in chronic fatigue syndrome or

fibromyalgia.  Defendant, has, tellingly, repeatedly refused to produce his CV to plaintiff

despite repeated requests.  (P. Brief at 17-18; HAR 457-HAR 00458).  Second, Dr.

Sniger never personally examined plaintiff; he merely reviewed her medical records and

the surveillance videotape.  (HAR 785-792).  Third, Dr. Sniger ignored and/or minimized

(i) the opinions of all plaintiff's long-time treating physicians that she is disabled; (ii)

plaintiff's subjective complaints of cognitive impairment, fatigue and pain; (iii) objective

medical evidence, including abnormal neuropsychological testing, MRI's, brain SPECT

scans, tilt table study, trigger points, labwork and bloodwork and (iv) the determination

of the Social Security Administration that plaintiff was totally disabled from any

occupation, focusing instead on the surveillance report and videotape.  Id.  Fourth,

relying largely on the videotape surveillance as well as on a personal statement by

plaintiff in which she admits to needing help with activities of daily living, including

dressing and personal hygiene, and states that she can carry 5-7 pounds, stand five

minutes, balance only for short periods, "sit for 90 minutes on a 'good day' with a pain

level of 10 (emergency level)," and perform minor daily chores with difficulty, Dr.

Sniger arbitrarily concludes that plaintiff can return to work with the following

restrictions:  "lifting/carrying of at least 10 pounds occasionally, reaching frequently;

sitting, fingering, feeling and handling constantly; opportunity to change positions as

needed."  (HAR 00792).  Lastly, Dr. Sniger's commentary regarding the surveillance

videotape with respect to plaintiff appearing "of normal weight . . . fit . . . with normal

strength, ROM [range of motion] and flexibility" and "show[ing] no signs of fatigue or

discomfort" during videotaped activity are impossible to validate objectively and demonstrate his clear bias toward defendant. (HAR 791). The Court is referred to Dr. Sniger's report for a complete and accurate assessment of its contents. (HAR 785-792).

85.    Admits, but plaintiff denies the accuracy and reliability of Dr. Sniger's report. The Court is referred to Dr. Sniger's report for a complete and accurate assessment of its contents. (HAR 785-792).

86.    Denies. Again, plaintiff denies the accuracy and reliability of Dr. Sniger's report. The Court is referred to plaintiff's response to ¶78. Plaintiff admits that Dr. Levine was of the opinion that plaintiff could not work, but, again, the Court is referred to Dr. Sniger's report for a complete and accurate assessment of its contents. (HAR 785-792).

87.    Admits that Dr. Sniger drew the stated conclusions, but denies the accuracy and reliability of Dr. Sniger's report. The Court is referred to plaintiff's response to ¶84. The Court is also referred to Dr. Sniger's report for a complete and accurate assessment of its contents. (HAR 785-792).

88.    Admits that Dr. Sniger drew the stated conclusions, but denies the accuracy and reliability of Dr. Sniger's report. The Court is referred to plaintiff's response to ¶84. The Court is also referred to Dr. Sniger's report for a complete and accurate assessment of its contents. (HAR 785-792).

89.    Admits that Dr. Sniger drew the stated conclusions, but denies the accuracy and reliability of Dr. Sniger's report. The Court is referred to plaintiff's response to ¶84. The Court is also referred to Dr. Sniger's report for a complete and accurate assessment of its contents. (HAR 785-792).

90.    Admits that an Employability Analysis Report ("EAR") was obtained, but denies the accuracy and reliability of the report.  As the EAR was wholly based on Dr. Sniger's report, which is, itself, inaccurate and unreliable, the EAR is, consequently, also inaccurate and unreliable.  The Court is referred to plaintiff's response to ¶84.  Denies that Ms. Fleisher "found" anything.  (HAR 661-667.)  To the contrary, Fleisher simply ignored Dr. Levine's opinion and parroted back Dr. Sniger's opinion that plaintiff retained the capacity to perform a sedentary job.  (HAR 661-662).  There is no evidence given for Fleisher's conclusion that plaintiff possessed transferable skills or for any of her other conclusions.  The Court is referred to the EAR for a complete and accurate assessment of its contents.  (HAR 661-667).

91.    Admits, but the Court is referred to Hartford's discontinuation letter for a complete and accurate assessment of its contents.  (HAR 485-491).

92.    Admits that the letter summarized certain medical records, including the Physical Capacities Evaluations, but objects to defendant's use of the term "pertinent," as it is clear that not all of plaintiff's records are summarized therein.  Moreover, plaintiff denies the accuracy and reliability of Hartford's review and letter, as they rely largely on (i) the surveillance report and video (the Court is referred to plaintiff's response to ¶67); (ii) Dr. Sniger's report (the Court is referred to plaintiff's response to ¶84); and (iii) the EAR (the Court is referred to plaintiff's response to ¶90) which are, themselves, inaccurate and unreliable.  The Court is referred to Hartford's discontinuation letter for a complete and accurate assessment of its contents.  (HAR 485-491).

93.     Denies the accuracy and reliability of Hartford's review and letter, as they rely largely on (i) the surveillance report and video (the Court is referred to plaintiff's response to ¶67); (ii) Dr. Sniger's report (the Court is referred to plaintiff's response to ¶84); and (iii) the EAR (the Court is referred to Plaintiff's response to ¶90) which are, themselves, inaccurate and unreliable.  The Court is referred to Hartford's discontinuation letter for a complete and accurate assessment of its contents.  (HAR 485-491).

94.     Admits that Defendant discontinued her LTD benefits due to its determination that she was capable of working as an administrative assistant or executive secretary.  Denies the accuracy and reliability of Hartford's review and letter, as they rely largely on (i) the surveillance report and video (the Court is referred to plaintiff's response to ¶67); (ii) Dr. Sniger's report (the Court is referred to plaintiff's response to ¶84); and (iii) the EAR (the Court is referred to plaintiff's response to ¶90) which are, themselves, inaccurate and unreliable.  The Court is referred to Hartford's discontinuation letter for a complete and accurate assessment of its contents.  (HAR 485-491).

95.     Admits that she underwent a neuropsychological evaluation (HAR 222-237), but points out that there were cognitive impairments noted in plaintiff's medical records all along.  Hartford simply chose to ignore these in rendering its determination.  The Court is referred to Hartford's discontinuation letter for a complete and accurate assessment of its contents.  (HAR 485-491).

96.     Admits that an interview and the stated tests were conducted in addition to numerous other tests not mentioned by defendant, including VCI, Rey

25

Complex Figure Test, WIAT-II Spelling subtest, D-KEFS, WMS III – Auditory Immediate Memory Test, Watson-Glaser and Frontal Behaviors Systems Scale.  The Court is referred to Dr. Shea's report regarding his neuropsychological evaluation of plaintiff for a complete and accurate assessment of its contents.  (HAR 222-237).

97.    Admits that there was a mistake in Dr. Shea's report concerning plaintiff's education level.  (HAR 225, 228, 229, 232).  Denies that this mistake invalidated any portion of the neuropsychological evaluation or the conclusions Dr. Shea drew therefrom.  The Court is referred to Dr. Shea's report regarding his neuropsychological evaluation of plaintiff for a complete and accurate assessment of its contents.  (HAR 222-237).

98.    Admits, but the Court is referred to Dr. Shea's report regarding his neuropsychological evaluation of plaintiff for a complete and accurate assessment of its contents.  (HAR 222-237).

99.    Admits, but Dr. Shea not only states that plaintiff's cognitive impairments render her disabled from her own occupation, but from any occupation.  The Court is referred to Dr. Shea's report regarding his neuropsychological evaluation of plaintiff for a complete and accurate assessment of its contents.  (HAR 222-237).

100.    The Court is referred to plaintiff's response to ¶97.  The Court is also referred to Dr. Shea's report regarding his neuropsychological evaluation of plaintiff for a complete and accurate assessment of its contents.  (HAR 222-237).

101.    Admits, but the Court is referred to Dr. Shea's report regarding his neuropsychological evaluation of plaintiff for a complete and accurate assessment of its contents.  (HAR 222-237).

102.    Admits, but the Court is referred to plaintiff's appeal letter for a complete and accurate assessment of its contents.  (HAR 205-221).

103.    Admits that Dr. Shoemaker found plaintiff to be disabled from all occupations.  (HAR 274).  Denies defendant's claim of bias.  The sections of the report quoted by defendant do not demonstrate bias, but rather the frustration of a treating physician at an insurer's shoddy and unfair handling of his patient's case.  Indeed, in his report, Dr. Shoemaker, in reviewing the materials sent to him by defendant, stated, "It is clear to me that the objective laboratory findings in this case have been discarded or not considered."  (HAR 00275).  He expressed his concern that "none of the third party reviewers from Hartford recorded a complete list of the symptoms that are disabling for [Jacoby] to this day nor did any physician bother to look at her marked abnormalities in innate immune responses documented by lab tests done by nationally accredited, CLIA approved, high complexity laboratories."  (HAR 00275).  The Court is referred to Dr. Shoemaker's report for a complete and accurate assessment of its contents.  (HAR 274-282).

104.    Admits that Dr. Shoemaker and plaintiff made these statements, but denies that there is a contradiction.  Plaintiff's statement that she has "full use of my hands and fingers" is not an admission that she could for long periods of time use a keyboard and mouse in a work situation.  The Court is referred to Dr. Shoemaker's report (HAR 274-282) and plaintiff's Continuing Disability Statement (HAR SIU 54-61) for a complete and accurate assessment of their contents.

105.    Admits, but Dr. Natelson also wrote that plaintiff fulfilled the case definition for chronic fatigue syndrome.  (HAR 383-384).  The Court is referred to Dr. Natelson's report for a complete and accurate assessment of its contents.  Id.

106.    Admits, but the Court is referred to Dr. Natelson's report for a complete and accurate assessment of its contents.  Id.

107.    Admits that defendant obtained reviews from Drs. Garrido-Castillo and Siegel.  However, plaintiff denies defendant's contention that these consultants are independent.  As detailed above, Drs. Garrido-Castillo and Siegel, who are employed by UDC, which maintains a long and fruitful financial relationship with Hartford — one that has drawn scrutiny from courts — are not independent.  (P. Brief at 12-14).  In addition, defendant sandbagged plaintiff by having two doctors review her appeal without giving her an opportunity to respond.  An insurer may not "sandbag" a claimant by failing to permit the claimant to review and comment upon all documents, records and information relevant to the claim.  The April 23, 2007 final denial relied on reports by Drs. Siegel and Garrido-Castillo to which plaintiff neither had access nor an opportunity to rebut.  (P. Brief at 29-30).  The Court is referred to Hartford's denial letter for a complete and accurate assessment of its contents.  (HAR 1-15).

108.    Denies.  Dr. Garrido-Castillo states that plaintiff was taking St. John's Wort, an herbal supplement, as well as Klonopin.  He, furthermore, states that there was a question as to whether Prozac should be tried instead of the herbal supplement.  (HAR 552, 562).  The Court is referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents.  (HAR 551-563).

109.    Admits that Dr. Garrido-Castillo noted such things, but denies the accuracy and reliability of his report. First, Dr. Garrido-Castillo, an employee of UDC, was not independent. The Court is referred to plaintiff's response to ¶107. Second, Dr. Garrido-Castillo never personally examined plaintiff; he merely reviewed her medical records and the surveillance videotape. Third, Dr. Garrido-Castillo ignored and/or minimized (i) the opinions of all plaintiff's long-time treating physicians that she is disabled; (ii) plaintiff's subjective complaints of cognitive impairment; (iii) objective medical evidence, including abnormal neuropsychological testing, MRI's and brain SPECT scans; and (iv) the determination of the Social Security Administration that plaintiff was totally disabled from any occupation. Fourth, Dr. Garrido-Castillo ignored and/or minimized (i) the neurocognitive deficits found by Dr. Shea; (ii) the neurocognitive deficits which he found to exist on the basis of his review (deficits in reading accuracy, visual processing, processing information, ability to handle relatively complex information) (HAR 562-563); and (iii) the possible impairment of such deficits when considered in combination with "the significant difficulties [that] exist to her returning to work . . . due to her physical condition." (HAR 562). He arbitrarily concluded that plaintiff could attempt a "trial return to work under structured and supervised conditions." (HAR 562-563). The Court is referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents. (HAR 551-563).

110.    Admits that Dr. Garrido-Castillo reviewed Dr. Shea's evaluation, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶109. The Court is also referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents. (HAR 551-563).

111.    Admits that Dr. Garrido-Castillo reviewed the results of testing conducted by Dr. Shea, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶109. The Court is also referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents. (HAR 551-563).

112.    Admits that Dr. Garrido-Castillo made such an observation, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶109. The Court is also referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents. (HAR 551-563).

113.    Admits that Dr. Garrido-Castillo's report says this, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶109. The Court is also referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents. (HAR 551-563).

114.    Denies. Dr. Shea's opinion that plaintiff was disabled was based not just on her level of working memory, but on deficits demonstrated on a number of measures, including perceptual organization, speed of information processing, visual attention and concentration, auditory and visual memory and reading comprehension. (HAR 232). The Court is referred to Dr. Shea's report regarding his neuropsychological evaluation of plaintiff (HAR 222-237) and Dr. Garrido-Castillo's report (HAR 551-563) for a complete and accurate assessment of their contents.

115.    Admits that Dr. Garrido-Castillo drew such conclusions, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶109. The Court is also referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents. (HAR 551-563).

30

116.    Admits that Dr. Garrido-Castillo stated this, but denies the accuracy and reliability of his report.  The Court is referred to plaintiff's response to ¶109.  The Court is also referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents.  (HAR 551-563).

117.    Admits that Dr. Garrido-Castillo wrote this, but denies the accuracy and reliability of his report.  The Court is referred to plaintiff's response to ¶109.  The Court is also referred to Dr. Garrido-Castillo's report for a complete and accurate assessment of its contents.  (HAR 551-563).

118.    Admits that Hartford obtained Dr. Siegel's review, but denies the accuracy and reliability of his report.  First, Dr. Siegel, an employee of UDC, was not independent.  The Court is referred to plaintiff's response to ¶107.  Second, Dr. Siegel never personally examined plaintiff; he merely reviewed her medical records and the surveillance videotape.  Third, Dr. Siegel ignored and/or minimized (i) the opinions of all plaintiff's long-time treating physicians that she is disabled; (ii) plaintiff's subjective complaints of cognitive impairment; (iii) objective medical evidence, including abnormal neuropsychological testing, MRI's and brain SPECT scans; and (iv) the determination of the Social Security Administration that plaintiff was totally disabled from any occupation.  Fourth, while admitting he had "no indication what Ms. Jacoby does on a typical day or day-to-day basis," Dr. Siegel concluded that plaintiff is independent with her activities of daily living.  (HAR 00548).  He arbitrarily concluded that plaintiff is able to perform "full-time sedentary-light physical demand work activities on a consistent basis."  (HAR 00549).  Without giving any explanation as to how he came up with his recommendations, however, or any idea as to where a job fitting these restrictions might

31

exist in the real world, he opined that: "physical restrictions initially appear medically necessary and appropriate. The physical restrictions could include a zero to 10-pound lifting restriction, alternating sitting and standing, frequent rotation of job tasks and activities, and avoidance of prolonged sitting, standing or walking activities . . . The ability to self-regulate during the workday is also suggested . . . A highly structured work environment with supervision is recommended." (HAR 000549). The Court is referred to Dr. Siegel's report for a complete and accurate assessment of its contents. (HAR 534-550).

119.    Admits that Dr. Siegel provided a report which outlined and analyzed certain of plaintiff's medical records, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶118. The Court is also referred to Dr. Siegel's report for a complete and accurate assessment of its contents. (HAR 534-550).

120.    Admits that Dr. Siegel stated this, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶118. The Court is also referred to Dr. Siegel's report for a complete and accurate assessment of its contents. (HAR 534-550).

121.    Admits that Dr. Siegel drew the stated conclusions and claimed there were inconsistencies between plaintiff's reported limitations and the activity observed during surveillance, but denies the accuracy and reliability of his report (the Court is referred to plaintiff's response to ¶118) as well as the accuracy and reliability of the surveillance report and video (the Court is referred to plaintiff's response to ¶67).

The Court is also referred to Dr. Siegel's report for a complete and accurate assessment of its contents. (HAR 534-550).

122.    Admits that Dr. Siegel drew the stated conclusions, but denies the accuracy and reliability of his report. The Court is referred to plaintiff's response to ¶118. The Court is also referred to Dr. Siegel's report for a complete and accurate assessment of its contents. (HAR 534-550).

123.    Admits that Hartford denied Plaintiff's LTD appeal by letter dated April 23, 2007, but denies the accuracy and reliability of Hartford's review and letter, as they rely largely on (i) the surveillance report and video (the Court is referred to plaintiff's response to ¶67); (ii) Dr. Sniger's report (the Court is referred to plaintiff's response to ¶84); and (iii) the EAR (the Court is referred to plaintiff's response to ¶90) which are, themselves, inaccurate and unreliable as well as (iv) the reports of Drs. Garrido-Castillo and Siegel to which plaintiff had no access or opportunity to rebut. The Court is referred to Hartford's denial letter for a complete and accurate assessment of its contents. (HAR 1-15).

124.    Admits that Hartford outlined the evidence it relied on in its denial of plaintiff's LTD appeal, but denies the accuracy and reliability of Hartford's review and letter. The Court is referred to plaintiff's response to ¶123. The Court is also referred to Hartford's denial letter for a complete and accurate assessment of its contents. (HAR 1-15).

125.    Admits that Hartford wrote a 15-page long denial letter, upholding its decision to discontinue plaintiff's LTD benefits, but denies the accuracy and reliability of Hartford's review and letter. The Court is referred to plaintiff's response to ¶123. The

Court is also referred to Hartford's denial letter for a complete and accurate assessment of

its contents.  (HAR 1-15).

Dated: New York, New York
       April 18, 2008

                                        Yours etc.,


                                        RIEMER & ASSOCIATES LLC
                                        Attorneys for Plaintiff
                                        60 East 42nd Street, Suite 2430
                                        New York, New York 10165
                                        (212) 297-0700


                                   By: _____
                                        Scott M. Riemer (SR5005)

## CERTIFICATE OF SERVICE

I hereby certify that I am attorney for Plaintiff and that, on April 18, 2008, I electronically filed a copy of PLAINTIFF'S RESPONSE TO DEFENDANT'S 56.1 STATEMENT and served a true and correct copy of same by Federal Express on the following:

> Christina H. Bost Seaton
> Troutman Sanders LLP
> The Chrysler Building
> 405 Lexington Ave.
> New York, New York 10074
> 212-704-6000

Dated: New York, New York
        April 18, 2008

SCOTT M. RIEMER (SR5005)\
RIEMER & ASSOCIATES LLC
60 East 42nd Street, Suite 2430
New York, New York  10165
(212) 297-0700